DORSEY et al., Appellants and Cross–Appellees,

v.

CONTEMPORARY OBSTETRICS & GYNECOLOGY,
INC. et al., Appellees and Cross–Appellants.

[Cite as *Dorsey v. Contemporary Obstetrics & Gynecology, Inc.* (1996), 113 Ohio App.3d 75.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 15263.

Decided July 26, 1996.

*Charles W. Slicer,* for appellants and cross-appellees.

*Andrew Storer,* for appellees and cross-appellants.

GRADY, Judge.

William Dorsey appeals from a partial summary judgment in favor of Contemporary Obstetrics & Gynecology, Inc. ("Contemporary"), Michael Clark, Liam Duggan, and Kimberly Warren. Specifically, Dorsey contends that the trial court erred when it found that there were no genuine issues of material fact as to whether a stock redemption agreement between Dorsey, Clark, Duggan, and Warren was unconscionable or whether corporate goodwill should have been considered in the valuation of Dorsey's shares of stock. Further, Dorsey contends that the trial court erred when it failed to find that, pursuant to the doctrine of promissory estoppel, representations made by the shareholders of Contemporary precluded the method of valuation set forth in the stock redemption agreement.

Contemporary, Clark, Duggan, and Warren cross-appeal from the judgment of the trial court valuing Dorsey's share in Contemporary at $209,476 pursuant to a stock redemption agreement that valued each owner's stock according to a proportionate share of the corporation's "accounts receivable." Specifically, Contemporary, Clark, Duggan, and Warren contend that the trial court erred when it adopted for the term "accounts receivable" a definition that includes amounts unearned and unbillable as well as collected amounts that the company did not own. Contemporary, Clark, Duggan, and Warren contend that this interpretation resulted in an overvaluation of Dorsey's share in the company.

With respect to Dorsey's first and second assignments of error, we conclude that the trial court did not err in finding that there was *no genuine issue of material fact* to preclude partial summary judgment on Dorsey's claim.

With respect to the argument raised in Dorsey's third assignment of error, we conclude that Dorsey failed to properly raise this issue below, and we will not consider it for the first time upon appeal.

With respect to Contemporary's, Clark's, Duggan's, and Warren's first and second cross-assignments of error, we conclude that the trial court erred in adopting the definition of the term "accounts receivable" that it applied to the stock redemption agreement.

## I

Contemporary provides professional medical services to patients of Dorsey, Clark, Duggan, and Warren, who were all doctors and shareholders of Contemporary, each shareholder owning twenty-five percent of the total shares outstanding.

In March 1991, the shareholders held a meeting at which, among other topics, the issue of valuation of corporate shares was discussed. According to Dorsey, the shareholders, except for Clark, who was absent, agreed that a twenty-five percent share of Contemporary was worth $500,000. This agreement was reached in connection with a proposal to offer a twenty-percent interest in Contemporary to an interested buyer for $450,000.

On May 1, 1991, Dorsey, Clark, Duggan, and Warren entered into an "Amended and Restated Stock Redemption Agreement" that required Contemporary to redeem the stock of any "withdrawing" shareholder within three years after the shareholder's withdrawal upon the terms set forth in the agreement. The redemption price of the stock was to be calculated pursuant to the following formula:

"The Redemption Price for the One Hundred (100) shares of Stock of each Stockholder shall be equal to one-fourth (¼) of the Corporation's accounts receivable at the end of the month preceding the death, disability, retirement or withdrawal of any Stockholder after said accounts receivable are first adjusted for bad debts. The bad debt adjustment shall be equal to the historical bad debt rate over the preceding twelve (12) month period."

Dorsey resigned from Contemporary effective June 12, 1992. Soon after, Contemporary offered Dorsey $66,287 for his one hundred shares of the company's stock.

On April 15, 1993, Dorsey and his wife filed a complaint for a declaratory judgment to establish the correct amounts owed to him by Contemporary, Clark, Duggan, and Warren. The matter was referred to a magistrate for trial and report on all issues of law and fact.

On March 8, 1994, Contemporary, Clark, Duggan, and Warren filed a motion for partial summary judgment pursuant to Civ.R. 56. The magistrate sustained the motion, finding that the correct method of valuing Dorsey's shares was established by the stock redemption agreement.

On September 9, 1994, a trial was held in which the magistrate heard from experts for both parties as to the amount owed Dorsey for his shares. In a report to the trial court, the magistrate concluded that Dorsey's one hundred shares of Contemporary were worth $209,476. Both parties filed timely objections, with Dorsey objecting to the magistrate's decision to grant the defendant's motion for partial summary judgment and Contemporary, Clark, Duggan, and Warren objecting to the findings and conclusions in the magistrate's report.

With respect to Dorsey's objections, the trial court affirmed the magistrate's decision granting the motion for partial summary judgment. With respect to Contemporary's, Clark's, Duggan's, and Warren's objections, the trial court adopted the magistrate's report regarding the valuation of Dorsey's shares, but modified the report with regard to the magistrate's determination that the individual shareholders were personally obligated to redeem Dorsey's shares and with regard to the conclusion that a money judgment rather than a declaratory judgment should be entered against the defendants.

From the judgment of the trial court, Dorsey appeals and Contemporary, Clark, Duggan, and Warren cross-appeal.

## II

Dorsey's first assignment of error:

"The trial court erred wherein it held, upon summary judgment, that there was no genuine issue of material fact as to whether specific performance of the contract would be unconscionable."

Dorsey's second assignment of error:

"The trial court erred in finding that no genuine issue of material fact existed regarding the existence of valuable goodwill and the valuation of Contemporary."

Dorsey maintains that a significant variance between the value of his stock pursuant to the stock redemption agreement and the market value of his stock presents a genuine issue of material fact as to whether the stock redemption agreement was unconscionable. Further, he argues that the absence of goodwill as an asset in the stock redemption formula suggests that the stock redemption agreement was unconscionable.

Summary judgment shall be rendered if "the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Civ.R. 56(C); *AAAA Ent., Inc. v. River Place Community Urban Redev. Corp.* (1990), 50 Ohio St.3d 157, 161,

553 N.E.2d 597, 600–601;. *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801–802.

In ruling on a Civ.R. 56(C) motion, the trial court must construe the evidence most strongly in favor of the nonmovant. Civ.R. 56(C); *Bowen v. Kil–Kare, Inc.* (1992), 63 Ohio St.3d 84, 88, 585 N.E.2d 384, 388–389.

The critical inquiry for the trial court in determining if genuine issues of material fact exist is whether the evidentiary material presents " 'a sufficient disagreement to require submission to a jury,' " or whether it is " 'so one-sided that one party must prevail as a matter of law.' " *Turner v. Turner* (1993), 67 Ohio St.3d 337, 340, 617 N.E.2d 1123, 1126. The material facts are determined by the applicable substantive law. *Perez v. Scripps–Howard Broadcasting Co.* (1988), 35 Ohio St.3d 215, 218–219, 520 N.E.2d 198, 201–203.

After construing the evidence most strongly in favor of Dorsey, we conclude that there is no question as to any material fact that precludes summary judgment in favor of Contemporary, Clark, Duggan, and Warren on the issue of unconscionability.

As a threshold matter, absent unconscionability, "Ohio courts have held the concept of 'freedom of contract' to be fundamental to our society." *Royal Indemn. Co. v. Baker Protective Serv., Inc.* (1986), 33 Ohio App.3d 184, 186, 515 N.E.2d 5, 7. This court has defined unconscionability as "an absence of meaningful choice on the part of one of the parties to a contract, combined with contract terms that are unreasonably favorable to the other party." *Collins v. Click Camera & Video, Inc.* (1993), 86 Ohio App.3d 826, 834, 621 N.E.2d 1294, 1299.

■ The unconscionability doctrine consists of two prongs:

(1) substantive unconscionability, *i.e.,* unfair and unreasonable contract terms, and

(2) procedural unconscionability, *i.e.,* individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible.

Substantive unconscionability is the product of unfair terms that are commercially unreasonable:

"Substantive unconscionability involves those factors which relate to the *contract terms themselves* and whether *they* are commercially reasonable. Because the determination of commercial reasonableness varies with the content of the contract terms at issue in any given case, no generally accepted list of factors has been developed for this category of unconscionability." *Collins,* 86 Ohio App.3d at 834, 621 N.E.2d at 1299.

■ There is no question as to any material fact regarding the express terms of the stock redemption formula. Both parties have stipulated to the terms of the stock redemption formula, and both the magistrate and the trial court reviewed and interpreted those same terms.

The stock redemption formula is based upon a twenty-five percent share of accounts receivable less an adjustment for bad debts. The formula presents a plausible method to calculate the value of a shareholder's interest in that it is related to the assets of the corporation and does not include any capricious or arbitrary standard. The fact that the use of this formula results in stock value below other possible methods of valuation is not controlling. Accordingly, we find that the terms of the stock redemption formula are not substantively unconscionable.

■ Procedural unconscionability involves factors that focus on the relative bargaining positions of the contracting parties.

The facts are uncontroverted that Dorsey, Clark, Duggan, and Warren met as equal shareholders in the corporation when they executed the stock redemption agreement. There is no evidence to suggest that Dorsey was incapable of negotiating terms other than those that appear in the stock redemption agreement. Accordingly, we find that the circumstances surrounding the bargaining and execution of the stock redemption agreement were not procedurally unconscionable.

■ Dorsey contends that the omission of goodwill as an asset in the stock redemption formula further suggests that the formula was unconscionable. There is no question that goodwill is a quantifiable asset of a business that can be valued for the purposes of distribution. See *Spayd v. Turner, Granzow & Hollenkamp* (1985), 19 Ohio St.3d 55, 59–62, 19 OBR 54, 57–60, 482 N.E.2d 1232, 1236–1238. Dorsey argues that the absence of goodwill in the redemption formula is indicative of an unconscionable contract.

Dorsey cites no authority for his proposition, nor is one likely to exist. There is no public policy requiring goodwill to be included as an asset necessary to a valid contractual stock redemption formula. Furthermore, in a small, closely held professional corporation, the identity of the principals, who are the persons providing professional services to the public, is inextricably bound up with the goodwill enjoyed by the corporation. When one of those principals leaves the corporation, the value of its goodwill may change. Accordingly, the absence of goodwill from the stock redemption agreement has no bearing upon our unconscionability analysis.

Dorsey's first and second assignments of error are overruled.

## III

Dorsey's third assignment of error:

"The trial court erred wherein it failed to find that defendants should be estopped from asserting the specific language of the agreements pursuant to the doctrine of promissory estoppel."

Dorsey contends that representations regarding the value of his twenty-five-percent interest in Contemporary made at the March 1991 shareholders' meeting precludes Contemporary from enforcing the stock redemption formula in the agreement under the doctrine of promissory estoppel. Specifically, Dorsey claims that Duggan and Warren "promised" him in the March 1991 meeting that his one hundred shares were worth $500,000, and that because he relied on that promise when he signed the stock redemption agreement in May 1991 he should not be held to the express terms of the stock redemption formula.

"Promissory estoppel" is defined as:

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *McCroskey v. State* (1983), 8 Ohio St.3d 29, 30, 8 OBR 339, 341, 456 N.E.2d 1204, 1205.

Assuming that Duggan and Warren, in fact, made promises to Dorsey regarding the value of his shares, we are skeptical that those promises would reasonably have induced Dorsey to sign a redemption agreement which made no mention of the March 1991 meeting or of any specific set value for his stock. Nevertheless, we need not further consider Dorsey's promissory estoppel argument because he failed to raise this issue in the trial court.

A careful review of the record shows that Dorsey first raised the issue of promissory estoppel in this appeal and not in the trial court. As a general rule, "[i]n the absence of plain error, this court need not consider an issue not raised below." *Lakewood v. All Structures, Inc.* (1983), 13 Ohio App.3d 115, 115–116, 13 OBR 133, 134, 468 N.E.2d 378, 379 (citing *State v. Williams* [1977], 51 Ohio St.2d 112, 117, 5 O.O.3d 98, 101, 364 N.E.2d 1364, 1367–1368). Accordingly, we need not consider Dorsey's promissory estoppel argument because he failed to raise it in the trial court.

Dorsey's third assignment of error is overruled.

## IV

Contemporary's, Clark's, Duggan's, and Warren's first and second cross-assignments of error are as follows:

"The lower court erroneously failed to exclude unearned and unbillable amounts relative to obstetric services from the corporation's accounts receivable as of May 31, 1992.

"The lower court erroneously failed to exclude the sum of $289,677.00 from the accounts receivable of the corporation as the same was not a receivable, but rather the property of Upper Valley/Stouder Memorial Hospital (SMH)."

The cross-appellants contend that the trial court erred by including within the term "accounts receivable" as it is set forth in the stock redemption formula an account composed of potential charges to pregnant patients for obstetric services not yet rendered. Contemporary's business practice was to "book" $1,500 within the accounts receivable summary for obstetric patients when they first consulted Contemporary for their anticipated prenatal, delivery, and postnatal services. They argue that those charges do not fit the definition of accounts receivable because the services had not yet been performed and there was the possibility that the full amount charged would not be collected if, for example, the pregnancy terminated early. Accordingly, cross-appellants maintain that the obstetrics account, totaling $267,325, should have been deducted from the "accounts receivable" total when the trial court calculated the value of Dorsey's shares under the stock redemption formula.

Contemporary, Clark, Duggan, and Warren similarly argue that the trial court erred in including in its determination of "accounts receivable" an account for Upper Valley/Stouder Memorial Hospital ("the hospital") that Contemporary was paid as a flat fee for medical services provided by the doctor-employees pursuant to a written contract, which expired on March 1, 1992, but continued month to month until December 1992. Pursuant to the contract, Contemporary was to collect fees from the individual patients for the services performed by Contemporary and transfer those fees to the hospital. In effect, the account represented funds held by Contemporary for the hospital pending distribution to it. Contemporary argues that the account does not fit the definition of accounts receivable because Contemporary was not entitled to keep the amounts collected, but was required to transfer those amounts to the hospital.

The stock redemption formula explicitly establishes that the redemption price shall be equal to "one-fourth (¼) of the Corporation's accounts receivable at the end of the month preceding the death, disability, retirement or withdrawal of any Stockholder after said accounts receivable are first adjusted for bad debts." On its face, the term "accounts receivable" is not patently ambiguous. The term has been defined by numerous authorities and is commonly used within the accounting profession. However, when applying the stock redemption formula to value Dorsey's shares, the formula's reference to "accounts receivable" raises several possible interpretations, suggesting a latent ambiguity.

"A latent ambiguity is a defect which does not appear on the face of language used or an instrument being considered. It arises when language is clear and intelligible and suggests but a single meaning, but some intrinsic fact or some extraneous evidence creates a necessity for interpretation or a choice between two or more possible meanings, as where the words apply equally well to two or more different subjects or things." *Conkle v. Conkle* (1972), 31 Ohio App.2d 44, 51, 60 O.O.2d 144, 148, 285 N.E.2d 883, 887–888; *Am. Druggists' Ins. Co. v. Equifax, Inc.* (S.D.Ohio 1980), 505 F.Supp. 66. "Ambiguity exists where a contract is susceptible to two or more reasonable interpretations." *Id.* at 68.

Where a latent ambiguity exists, extrinsic evidence may be offered to determine the intended meaning of the parties. "Since latent ambiguity is only disclosed by extrinsic evidence, it may be removed by such evidence." *Conkle*, 31 Ohio App.2d at 51, 60 O.O.2d at 148, 285 N.E.2d at 887.

The magistrate heard extrinsic evidence from both parties in the form of expert testimony to determine the value of Dorsey's shares. Dorsey presented Greg Torman, C.P.A., who testified that accounts receivable are defined as "amounts that are reasonably expected to be collected at some point." Torman further testified that based upon Contemporary's accounts receivable summary, the obstetrics account and the hospital account were treated as accounts receivable by the company and should be included in the valuation of Dorsey's shares.

In response, Contemporary presented Michael A. Kopp, C.P.A., whose firm performed regular accounting services for Contemporary. Kopp defined accounts receivable as "an amount that has been earned and recognized and that there is a strong likelihood that it will be collected." Kopp suggested that Torman's definition was not consistent with generally accepted accounting principles in that Torman's definition of accounts receivable did not require the amount to be "earned and recognized." Kopp further testified that Contemporary could record its accounts in any manner that it saw fit, although to do so might not conform to generally accepted accounting principles.

With respect to the hospital account, the trial court adopted the magistrate's finding that Contemporary consistently included amounts collected for the services it performed for the hospital in the corporation's accounts receivable and debited the account when those sums were tendered to the hospital. Accordingly, the trial court concluded that the account was properly included as an accounts receivable for purposes of the stock redemption agreement.

With regard to the obstetrics account, the trial court rejected Contemporary's argument that the term "accounts receivable" as it appeared in the stock redemption agreement required amounts to be "earned and recognized." The trial court concluded that there was a reasonable expectation of collecting for the

obstetrical services, and that these amounts were properly included in the valuation of Dorsey's shares.

The magistrate and the trial court appeared to place great emphasis on *Weinberg–Marcus Cardiomedical Group, Inc. v. Joffe* (June 2, 1986), Montgomery App. No. 9582, unreported, 1986 WL 6329, in which the term "book value" in a buy-sell agreement required the court's interpretation. As in this case, the court's interpretation of the term "book value" was in response to conflicting opinion on the proper method of accounting:

"Initially, the appellant contends that the court should have interpreted 'book value' as calling for accrual method book value, but according to the evidence, it is widely recognized that 'book value' may be calculated in any number of ways, and that parties to a buy-sell agreement are free to define book value as they choose. Therefore, in the absence of any contrary instructions in the buy-sell agreement, the court's calculation of book value by reference to the figures reflected on the corporate books cannot be faulted." *Id.*

We agree that the parties to an agreement are free to define its terms in any way they wish, and that a court interpreting their agreement may look to the dealings of the parties to define terms that the agreement does not. However, the court is not required to adopt these meanings as definitions, and should not when they fail to reasonably reflect the expectations of the parties concerning the matter in issue.

 Courts asked to enforce an agreement must identify the particular situations with respect to which the parties formed their expectations in entering into the agreement. The process in which the court engages is one of *interpretation*. If that interpretation determines that a situation involved in a dispute was omitted from the agreement, the court must engage in a process of *inference* to resolve the omission according to the actual expectations of the parties or general principles of fairness and justice. See Farnsworth, Omissions in Contracts (1968), 68 Colum.L.Rev. 860.

 The actual expectations of the parties concerning an omission in their written agreement may be determined by resort to parol evidence, *i.e.*, matters outside the four corners of the writing which are probative of their expectations. *Id.* The parol evidence most commonly employed for that purpose is evidence of the negotiations leading to the agreement. However, any dealings the parties have had relevant to the situation in dispute may be considered in determining what their expectations were concerning it.

The situation involved in the assignments of error presented by the cross-appellants concerns the value of the interest of any of the four equal shareholders who elects to exercise a shareholder's right under the redemption agreement to

withdraw from the corporation. The agreement provides that in that event the withdrawing shareholder will be paid one fourth of the corporation's "accounts receivable," less an amount for bad debts. Because the term "accounts receivable" was not expressly defined, the court was required to resolve that omission according to the actual expectations of the parties or general principles of fairness and justice.

The trial court sought to identify the actual expectations of the parties by resorting to parol evidence, their use of the term "accounts receivable" in the corporation's regular financial statements. The sense in which the term is used there may be applied to their stock redemption agreement to determine their expectation when they used it there, if the same sense is appropriate to that situation. 4 Williston On Contracts (3 Ed. 1961), Section 613. In our view, that same sense is wholly inappropriate to the redemption agreement.

The purpose of the redemption agreement is to permit any of the shareholders to redeem their interests in the corporation on withdrawal from it by requiring the corporation to compensate the withdrawing shareholder for a proportionate share of the corporation's accounts receivable. Because the respective shares owned by each of the four shareholders are equal, the value of the interest of any shareholder who remains must be the same as the value of the one who withdraws. If the interest of a withdrawing shareholder is defined to include amounts "booked" but not earned by the corporation, or amounts that the corporation merely collects and must remit to another, the withdrawing shareholder is enriched at the expense of those remaining, who have nothing more than an expectation to receive amounts "booked," and no expectation to retain the amounts the corporation must remit, both of which they must pay the shareholder who withdraws. Furthermore, if all four shareholders elect to withdraw at the same time the corporation will be rendered insolvent because the total value of the amounts the shareholders are entitled to receive would exceed the corporation's net assets. Therefore, the corporation's financial reports use the term "accounts receivable" in a sense inappropriate to the purposes of the stock redemption agreement, and the trial court erred when it sought to identify the expectations of the parties when they entered into that agreement by employing the term as it is in the financial reports.

"When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." 2 Restatement of the Law 2d, Contracts (1981), Section 204.

In this circumstance, the only meaning that can reasonably be applied to the term "accounts receivable" as it was used by the parties in their redemption agreement is the definition applied by the witness Michael A. Kopp: an amount

that has been earned and recognized and which is strongly likely to be collected. That definition does not include amounts as yet unearned by the corporation. Neither does it include amounts the corporation owes to the hospital, for which the corporation merely acts as a collection agent and conduit of monies due the hospital.

The trial court erred when it construed the redemption agreement as it did. The first and second assignments of error of cross-appellants Contemporary, Warren, Duggan, and Warren are sustained.

## V

Having sustained the assignments of error presented by the cross-appellants, we reverse the judgment of the trial court in those respects and remand the cause for further proceedings consistent with this opinion.

*Judgment reversed
and cause remanded.*

FAIN and FREDERICK N. YOUNG, JJ., concur.

FREDERICK N. YOUNG, Judge, concurring.

I agree that considering the purposes of the stock redemption agreement the term "accounts receivable" as used in it cannot, as a matter of law, be stretched to the illogical extreme of covering sums "booked" but unearned.

Even more so, the term cannot be used to include sums held in escrow, as it were, for Upper Valley/Stouder Memorial Hospital. Monies that belong to someone else are not "received" by the entity holding them in trust for the true owner. If it were otherwise, you might as well include all the employers' payroll deductions, including withheld taxes and social security payments, in accounts receivable.

I am not persuaded by the argument that since Contemporary routinely listed both the booked but unearned sums and the monies belonging to the hospital under accounts receivable, we should construe the term "accounts receivable" in the stock redemption agreement to include both those sums of money. As Judge Grady points out, the purpose of the stock redemption agreement here is to divide the corporation's value equally between the shareholders. That purpose would be totally frustrated by the holding of the trial court.

The corporation's purpose in including the amounts in issue under "accounts receivable" was probably no more than convenient and simplified bookkeeping, and that purpose has no bearing on the interpretation of the stock redemption agreement. "What's in a name?" * That which Contemporary calls accounts

---

* Apologies to the Bard. *Romeo and Juliet,* II, ii 43.

receivable in its books are not necessarily true accounts receivable. You may call a dog a horse until you're hoarse, but it's still a dog.