[Cite as *Cachat v. IQS, Inc.*, 2011-Ohio-3057.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 95501**

---

## JOHN CACHAT, ET AL.

PLAINTIFFS-APPELLANTS

vs.

## IQS, INC., ET AL.

DEFENDANTS-APPELLEES

---

## JUDGMENT:
## AFFIRMED

---

Civil Appeal from the
Cuyahoga County Common Pleas Court
Case Nos. CV-689839 and CV-727087

**BEFORE:** Blackmon, P.J., Celebrezze, J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:** June 23, 2011

**ATTORNEY FOR APPELLANTS**

Robert P. DeMarco
DeMarco & Triscaro, Ltd.
30505 Bainbridge Road
Suite 225
Solon, Ohio 44139


**ATTORNEYS FOR APPELLEES**

John S. Kluznik
Weston Hurd LLP
The Tower at Erieview
1301 East Ninth Street, Suite 1900
Cleveland, Ohio 44114-1862

Andrew G. May
Robert Radasevich
Neal, Gerber & Eisenberg, LLP
Two North LaSalle Street
Suite 1700
Chicago, Illinois 60602

PATRICIA ANN BLACKMON, P.J.:

{¶ 1} Appellants John Cachat and the Cachat Family Limited Partnership (jointly referred to as "CFLP") appeal the trial court's granting of summary judgment in favor of appellees IQS, Inc., Michael Rapaport, Wayne Bourlais, George Middleman, and Apex Investment Fund V, L.P. ( jointly referred to as "IQS") and assign the following three errors for our review:

**"I.   The trial court erred in finding that plaintiff was not entitled to non-competition payments pursuant to his amended and restated non-competition agreement."**

**"II.   The trial court erred in finding that plaintiff was not entitled to severance payments under Section 6.2 of his amended and restated employment agreement."**

**"III.   The trial court erred in finding that plaintiff was bound by the general release."**

{¶ 2}   Having reviewed the record and relevant law, we affirm the trial court's decision.   The apposite facts follow.

### Facts

{¶ 3}   In 2003, Cachat entered into negotiations with Apex Investment Fund, V, L.P. ("Apex") for the purpose of Apex infusing money into an Ohio Company founded by Cachat known as IQS, Inc.   As a result of the negotiations, on October 1, 2003,  a "Series A Convertible Preferred Stock Agreement" was entered into between Apex and IQS.   Pursuant to this agreement, Apex invested $2 million dollars in equity into IQS in exchange for convertible participating preferred stock in IQS.[1]

Employment Agreements

---

[1]On   March 19,   2004, Apex and IQS amended the agreement, pursuant to which Apex invested an additional $1 million dollars of equity in IQS in exchange for additional convertible participating preferred stock in IQS.

**{¶ 4}** As a condition to Apex's investment, Cachat was required to enter into various employment-related agreements with IQS. The primary agreement was an Executive Employment Agreement in which Cachat agreed to be employed as the Chief Vision Officer of IQS and act as the chairman of IQS's board of directors. Cachat also entered into a non-competition agreement agreeing not to compete with IQS for a year following the termination of his employment in exchange for $375,000.

**{¶ 5}** Despite Apex's initial infusion of $3 million, IQS was not profitable in subsequent years. By the fall of 2007, Apex had invested an additional $5 million dollars in the company in the form of loans, all of which were documented with promissory notes. Nine hundred thousand dollars in interest had accrued on the loans. Cachat and the company's president, Michael Rapaport, attempted to raise outside capital to no avail. Thus, the company was in need of additional cash from Apex in order to pay its bills and continue to operate.

**{¶ 6}** Apex agreed to provide additional funding, conditioned on the execution of new employment-related agreements by Cachat and Rapaport and the conversion of the outstanding principal balance of Apex's loans to preferred stock in the company. Accordingly, on October 2, 2007, Cachat entered into an amended executive employment agreement; non-solicitation;

non-disclosure, and developments agreement; and non-competition agreement.

**{¶ 7}** While the amended agreements were identical in some respects to the original agreements, they differed in significant ways. Among the changes were the automatic renewal date of Cachat's employment agreement was shortened from two years to one year, and the notice of non-renewal was reduced from 90 days to 30 days. Under the amended non-competition agreement, IQS had the option to bind Cachat to a one-year non-competition period following his termination from IQS, provided that IQS paid him $500,000. This was different from the automatic payment of $375,000 and an automatic one-year non-competition agreement. The amended non-competition agreement emphasized that whether to pay Cachat the $500,000 to not compete was within the company's "sole discretion."

**{¶ 8}** Each of the amended employment-related agreements also contained full integration clauses pursuant to which the parties agreed that the various agreements contained the full and complete expression of the parties' agreements and that the agreements could not be modified or amended absent a written document signed by all the parties.

General Release

**{¶ 9}** Along with obtaining funding from Apex, IQS's primary lender was KeyBank. By the spring of 2008, the principal balance of the loans was

$630,000. Cachat and CFLP had personally guaranteed the KeyBank loans and used their two commercial properties as collateral. At a meeting conducted in March 2008, IQS's board, including Cachat, discussed and unanimously passed a resolution authorizing Rapaport to negotiate with KeyBank to obtain a discount of the outstanding balance on the KeyBank loans in exchange for an immediate lump sum payment. On April 4, 2008, KeyBank agreed to accept IQS's offer to pay the lump sum payment of $350,000 in complete satisfaction of the KeyBank loans. On April 11, 2008, KeyBank sent a proposed settlement and release agreement memorializing the transaction, which was to be executed by KeyBank, IQS, Cachat, and CFLP.

{¶ 10} IQS did not have the $350,000 to pay the lump sum and requested a loan from Apex to cover the amount. Apex agreed to loan IQS $350,000 to retire the KeyBank loans provided that Cachat and CFLP agreed to fully and completely release all of the defendants and their affiliates from any conceivable claims they may have had against them. On April 22, 2008, Cachat, both personally and on behalf of CFLP, agreed to the release.

Termination of Employment

{¶ 11} On August 26, 2008, at an IQS board meeting, Cachat was hand-delivered a letter informing him that the company was not extending the term of his employment agreement beyond the expiration of the term,

which ran "through October 2008." The letter informed Cachat that his employment pursuant to the employment agreement would cease as of October 31, 2008 and that his employment as the company's Chief Vision Officer would end on November 1, 2008. Cachat continued as chairman of the board and remained a shareholder of the company. On November 25, 2008, Cachat sent an email tendering his resignation as director and from all officer positions with IQS.

{¶ 12} On April 10, 2009, Cachat filed a suit alleging nine counts against IQS, its president and board member, Michael Rapaport, and its two other board members, Wayne Boulais and George Middlemas. The counts asserted claims for breach of Cachat's original and amended employment agreements; declaratory judgment that the general release executed by Cachat was without consideration and unenforceable; declaratory judgment that Cachat's amended non-competition agreement was unenforceable; declaratory judgment that Cachat's original non-competition agreement was enforceable; fraudulent inducement to enter into the amended employment and amended non-competition agreements; fraudulent inducement to enter into Cachat's commission agreement; breach of the commission agreement; declaratory judgment that Cachat was entitled to be paid certain commissions; and, breach of implied covenants of good faith and fair dealing in Cachat's amended employment and commission agreements. On December 22, 2009,

Cachat filed an amended complaint adding CFLP as a plaintiff and Apex as a defendant. Cachat also added two more counts alleging IQS breached a lease agreement and that Apex fraudulently induced Cachat and CFLP to enter into a general release.

{¶ 13} The defendants filed a joint motion for summary judgment on all 11 counts; Cachat filed a brief in opposition. The only two counts that Cachat sought to defend in the motion in opposition was his severance claim and declaratory judgment that the general release was void for lack of consideration. He, however, also raised two additional claims that had not been raised in his complaint: one seeking damages under the amended non-competition agreement and one seeking damages for alleged breaches of fiduciary duties owed to Cachat.

{¶ 14} The trial court conducted a hearing on the motion for summary judgment. At the hearing, Cachat's attorney informed the court that Cachat and CFLP were abandoning all of the claims except for three: Cachat's claim for severance pay; for payment under the non-competition agreement, and the enforceability of the general release. After the hearing, the trial court issued a three page opinion in which it granted judgment in IQS's favor.

### Standard of Review

{¶ 15} We review an appeal from summary judgment under a de novo standard of review. *Baiko v. Mays* (2000), 140 Ohio App.3d 1, 746 N.E.2d 618,

citing *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 506 N.E.2d 212; *N.E. Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.* (1997), 121 Ohio App.3d 188, 699 N.E.2d 534. Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. Civ.R. 56 summary judgment is appropriate when: (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can reach only one conclusion that is adverse to the non-moving party.

## Non-competition Payments

{¶ 16} In his first assigned error, Cachat argues that summary judgment was not appropriate as to his claim for payment under the amended non-competition agreement, which required IQS to pay him $500,000. He argues there are material issues of fact in dispute regarding this issue.

{¶ 17} Cachat did not contend that he was entitled to the $500,000 pursuant to the amended non-competition agreement until he raised it in his response to IQS's motion for summary judgment. In fact, in his complaint Cachat argued that the prior non-competition agreement that required an automatic payment of $350,000 was enforceable, while the amended non-competition agreement was unenforceable. This argument is directly

contrary to his argument that he is entitled to the $500,000 under the amended agreement. Because Cachat did not seek payment under the amended non-competition agreement in his complaint, the trial court properly declined to find merit to his argument because a claim cannot be asserted for the first time in an opposition brief. *Saikus v. Ford Motor Co.* (Apr. 12, 2001), Cuyahoga App. No. 77802; *Akron Hydroelectric Co. v. Cuyahoga Falls* (1998), 128 Ohio App.3d 754, 716 N.E.2d 780; *Williams v. Time Warner Cable* (June 24, 1998), 9th Dist. No. 18663. Accordingly, Cachat's first assigned error is overruled.

{¶ 18} Nonetheless, even if we consider his argument, it has no merit. Art. I, Section 1.2 of the amended non-competition agreement provides:

> "**Payment. Among other considerations received by the Founder for the covenant contained in Section 1.1, the Company and the Founder agree that Section 1.1 shall be effective if, and only if,** *the Company, in its sole discretion, determines,* **at the time that the Founder ceases to be employed or engaged by the Company, to pay to the Founder, for such non-competition, an aggregate amount of five hundred thousand dollars ($500,000.00), \* \* \*. If the Company determines to make such payment, it shall notify the Founder of its decision within fifteen (15) business days from the date that the Founder ceased to be employed or engaged by the Company. \* \* \*.**" (Emphasis added.)

{¶ 19} Thus, pursuant to the above section, Cachat was prohibited from competing with IQS for one year following the termination of his employment only if IQS paid him $500,000. Cachat contends that his termination letter,

delivered on August 26, 2008, activated IQS's duty to pay him the $500,000 to not compete. The letter, written by IQS President Michael Rapaport, stated in pertinent part:

> **"Pursuant to Section 5.2 of the Employment Agreement, IQS hereby gives notice of its intention to not renew the Employment Agreement as of October 31, 2008 (the 'Termination Date'), which is the last day of the Initial Term of the Employment Agreement. * * *.**
>
> **"Your employment will continue through November 1, 2008, at which time you will cease to be employed by IQS. * * * Please note that the nonrenewal of the Employment Agreement and the subsequent termination of your employment with IQS will not have any effect on the Amended and Restated Non-competition Agreement and the Amended and Restated Non-solicitation, Non-disclosure and Developments Agreement, each between IQS and you and each dated October 2, 2007, each of which shall continue in full force and effect until otherwise terminated or until each expires in accordance with its terms."**

{¶ 20} The letter does not state that IQS had decided to pay Cachat the $500,000 to not compete. Moreover, the company's decision whether to pay

the amount was not required to be made until 15 days after the termination. The letter was written two months prior to Cachat's termination date.

**{¶ 21}** Additionally, the evidence shows that Cachat did not believe the termination letter activated the non-competition agreement. In a letter dated November 25, 2008, Cachat's attorney wrote a letter to IQS stating, "this letter serves to confirm that IQS has not exercised its right to enforce the non-competition covenant in the Amended and Restated Non-Competition Agreement between it and Mr. Cachat and that it has refused to provide Mr. Cachat with a written statement confirming its decision for some reason or other." Further, on January 13, 2009, Cachat emailed a letter to a third party in which he stated, "IQS failed to exercise its rights to enforce a non-compete agreement and, therefore, I am not under a non-compete agreement with IQS. I believe that IQS has the same understanding." These letters confirm that the August 2008 letter did not lead Cachat to believe that IQS was enforcing the non-competition agreement.

### Severance Payments

**{¶ 22}** In his second assigned error, Cachat argues that the trial court erred by granting summary judgment regarding his claim for severance payments. He claims the contract language was ambiguous and created a question of law.

{¶ 23} We note that Cachat failed to argue in the trial court that the language regarding what constitutes the end of his term was ambiguous. Thus, we are not required to address it. *Ingram v. Adena Health Sys.*, 149 Ohio App.3d 447, 452, 2002-Ohio-4878, 777 N.E.2d 901; *RBS Citizens, N.A. v. Zigdon*, Cuyahoga App. No. 93945, 2010-Ohio-3511. However, even if the argument was raised below, it has no merit.

{¶ 24} Section 5.1 stated that the term of Cachat's employment was as follows:

> "**<u>Initial and Renewal Terms</u>. The term of this Agreement commenced on October 1, 2003 and will continue through October, 2008 (the 'Initial Term') unless terminated earlier as provided in this Section 5. This Agreement shall thereafter be automatically renewed for successive one year periods (the 'Renewal Terms') unless terminated earlier as provided in Section 5.**"

{¶ 25} Cachat contends whether the contract was to end October 1 or October 31, 2008, was ambiguous and, therefore, created an issue of fact. If the end date is interpreted to be October 1, then he was not terminated prior to the renewal of his term of employment, which his termination letter stated was October 31, and he would, therefore, be entitled to severance pay under Section 6.2, which provides:

> "**If Executive's employment is terminated by the Company pursuant to Sections 5.3(a), (b), or (d), [death, disability, or without cause] the Company shall make severance payments to the Executive (or his legal representative in the case of death) equal to twelve (12) months of his**

**adjusted Base Compensation as of the Date of Termination (on the same pay dates) and, except for termination pursuant to Section 5.3(a), shall continue his employee benefit coverage and compensation on the same terms as prior to such termination for twelve (12) months from the effective date of termination. * * *"**

{¶ 26} "Language is ambiguous if the words of a writing are susceptible to two or more reasonable interpretations." *Dorsey v. Contemporary Obstetrics & Gynecology* (1996), 113 Ohio App.3d 75, 84, 680 N.E.2d 240. "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 374 N.E.2d 146, at paragraph two of the syllabus.

{¶ 27} We do not agree that the phrase "through October 2008" is ambiguous. If the drafter intended October 1, 2008 to be the end of the term, the contract would have stated "until October" or "to October." "Through" is commonly understood to mean the end of whatever the word precedes. Because the word is not ambiguous, we cannot consider the parol evidence Cachat relies upon to show that he was told he would receive severance pay. Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to

give effect to the parties' intentions. *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 132, 509 N.E.2d 411. When the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties. *Alexander*, at 246, 374 N.E.2d 146. We conclude the agreement is clear and unambiguous. Cachat was not entitled to severance pay if the contract is not extended and expires on its own terms, which is what occurred here.

{¶ 28} Cachat also argues that by extending his employment to November 1, even if the end of his term was October 31, he would be entitled to severance pay. However, the severance clause clearly is triggered based on termination prior to the end of a term. IQS clearly advised Cachat that his term, which ended October 31, 2008, would not be renewed. The extra day of employment did not constitute a renewal of the term given the written notice that the term was not being renewed, and it was clear that after the additional day, the employment terminated.

{¶ 29} Additionally, Cachat argued in the trial court that he did not understand the terms of the contract. However, the law in Ohio is that "parties to contracts are presumed to have read and understood them and that a signatory is bound by a contract that he or she willingly signed." *Preferred Capital Inc. v. Power Eng. Group Inc.*, 112 Ohio St.3d 429, 432,

2007-Ohio-257, 860 N.E.2d 741. Accordingly, Cachat's second assigned error is overruled.

## General Release

**{¶ 30}** In his third assigned error, Cachat argues that the trial court erred by concluding that the language in the 2008 General Release extinguished his claims. He argues the release only applied to pending claims, not future claims.

**{¶ 31}** The trial court's ruling regarding the general release has no impact on the claims at issue in this appeal. In its motion for summary judgment, IQS did not argue that Cachat's claim for severance benefits was extinguished by the release. IQS also did not argue that Cachat's claim under the amended non-competition agreement was extinguished by the general release, because this was not a claim raised in Cachat's complaint, but raised for the first time in the response brief. Moreover, the court did not rule that the general release extinguished any of the claims, but merely found that it was enforceable. Accordingly, Cachat's third assigned error is overruled.

Judgment affirmed.

It is ordered that appellees recover from appellants their costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

PATRICIA ANN BLACKMON, PRESIDING JUDGE

FRANK D. CELEBREZZE, JR., J., and
EILEEN A. GALLAGHER, J., CONCUR