**MILLER, Appellee,**

v.

**MILLER, Appellant.**

[Cite as *Miller v. Miller* (1993), 92 Ohio App.3d 340.]

Court of Appeals of Ohio,
Erie County.

No. E–92–61.

Decided Nov. 19, 1993.

*Peter J. McGory,* for appellee.

*Robert Lehrer*, for appellant.

SHERCK, Judge.

This is an appeal from an order of the Erie County Court of Common Pleas, Domestic Relations Division, which calculated a child support arrearage amount by crediting to a father his expenses incurred while attempting to establish companionship with his children in a foreign country. The court also suspended future child support obligations pending the custodial parent's compliance with the court's visitation order. Because we find the trial court acted within its discretion and its authority, we affirm.

The referee who heard the evidence in this matter characterized this case as "the most flagrant disregard of a father's rights that can be imagined * * *." Appellee, Donald W. Miller, married appellant, Norma W. Miller, on December 8, 1978. Two sons, now ages ten and thirteen, were born of the marriage. The youngest child was born with cerebral palsy.

The parties were granted a dissolution in 1985. The separation agreement, which was adopted as the order of the court in the decree of dissolution, provided for appellant to have custody of the children and for appellee to pay child support in the lump sum amount of $5,000 for 1985 and $500 per month thereafter. Appellee was to have "reasonable visitation" but no less than thirty days annually.

Following the dissolution, appellant, who is a British subject, returned to her native England accompanied by her children. Evidence submitted to the trial court in the present post-dissolution proceeding showed, and the court found, that at the time appellant left the United States she intended to prevent appellee from ever seeing his children again. Indeed, the evidence showed, and the trial court found, that once in the United Kingdom appellant made every effort to thwart appellee's rights to visitation.

In response to appellant's denying appellee access to his children, appellee retained British solicitors and petitioned the English courts for aid in enforcing his visitation rights. Although on several occasions the British courts ordered supervised visitation, appellant allowed visitation only on brief and infrequent occasions. In fact, the trial court found that between 1985 and 1991 the total amount of time appellee spent visiting his children was approximately five hours. Additionally, the reports of the British social workers who supervised these meetings suggested that the children came to those visits possessing what appeared to be a mixture of fear and hatred toward their father. The children eventually refused to have any contact with appellee. This, appellee asserts, was because appellant had "poisoned" the children's minds against him.

The present proceeding was initiated on August 3, 1990, when an Erie County Child Support Enforcement Agency ("CSEA") attorney, acting for appellant, filed a motion which sought an order requiring that appellee show cause why he should not be held in contempt for failure to pay child support. Appellee responded by moving (1) to cite appellant for contempt for failure to adhere to the court's visitation order, (2) to suspend, terminate or reduce appellee's current child support obligation, (3) to suspend, terminate, cancel and/or reduce the arrearage, and (4) to terminate wage withholding and tax refund interception.

The CSEA attorney, on behalf of appellant, eventually withdrew the motion to show cause and substituted in its place a request that the court establish an arrearage. On July 3, 1991, a hearing was held before a referee on appellant's request and appellee's motions. Following this hearing, the referee issued a report and recommendation wherein the following findings were made: (1) that between 1985 and mid–1988 appellee made direct payments to appellant in the amount of $10,800; (2) in 1988, frustrated by his denial of visitation, appellee ceased his direct payments and began to deposit these monies into savings accounts he had opened in the names of his sons; (3) these two accounts showed a balance of $17,382.16 as of May 31, 1991; (4) appellee's support obligation between 1985 and mid–1988 was $15,000; (5) appellee's support obligation from 1988 until May 31, 1991, was $17,500; (6) appellee had spent in excess of $12,000 in travel and legal fees in pursuit of his visitation rights in England; and (7) appellee and appellant's gross monthly incomes were $4,888 and $2,694 respectively.

Additionally, the referee concluded that:

"[Appellant] has so poisoned the minds of these children about [appellee], that it seems obvious to this Referee that [appellee] will never regain a parental relationship with his children as long as [appellant] has custody of them. [Appellant] has caused irreparable harm to these children. She has single-handedly turned two normal boys into two boys out of touch with reality and clutching to mommy's apron strings. [Appellant] has effectively terminated [appellee's] parental rights without the benefit of a court order, and without any evidence to justify such a termination. She has taken the laws of both the United States and Great Britain into her hands and she has effectively won."

The referee then made the following recommendations: (1) appellant be held in contempt for violation of the court's visitation orders, (2) appellee be granted a credit against arrearages for both payments made directly to appellant and for

the legal and travel expenses spent in pursuit of visitation,[1] and (3) payment on the resulting arrearage of $4,889.68 should not be enforced. Additionally, the referee recommended, based on findings that the children are not in need of appellee's financial assistance and that their best interest would be best served by allowing appellee "financial freedom" to pursue his visitation rights, that appellee's child support obligation be suspended effective the day he filed for modification and remain suspended until further order of the court.

Over appellant's objection, the trial court sustained the referee's report and recommendations and adopted it as the order of the court. From this order appellant brings this appeal, raising the following two assignments of error:

"No. 1. The trial court erred by suspending petitioner/appellee's current child support obligation, in violation of O.R.C. Section 3109.05(D).

"No. 2. The trial court erred and abused its discretion in crediting against petitioner/appellee's child support arrearage sums expended by petitioner/appellee in pursuit of his visitation rights, as, in essence, the trial court thereby retroactively modified petitioner/appellee's child support obligation."

"In general, when reviewing the propriety of a trial court's determination in a domestic relations case, this court has always applied the 'abuse of discretion' standard. * * * Since it is axiomatic that a trial court must have discretion to do what is equitable upon the facts and circumstances of each case, it necessarily follows that a trial court's decision in domestic relations matters should not be disturbed on appeal unless the decision involves more than an error of judgment. Upon a review of the statute governing child support, R.C. 3109.05, as well as the Child Support Guidelines set forth in C.P.Sup.R. 75 [now R.C. 3113.215], we believe that common sense and fundamental fairness compel the application of the 'abuse of discretion' standard in reviewing matters concerning child support and visitation rights. As this court has held many times, an ' "abuse of discretion" * * * implies that the court's attitude is unreasonable, arbitrary or unconscionable. * * *' " (Citations omitted.) *Booth v. Booth* (1989), 44 Ohio St.3d 142, 145, 541 N.E.2d 1028, 1031.

With the above standards in mind, we shall initially discuss appellant's second assignment of error.

## I

Appellant concedes that the court's decision to credit payments made directly by appellee to appellant against the accrued child support arrearage was

---

1. The referee found the money appellee had deposited in savings accounts for his children to be completed gifts under the Gift to Minors Act and, therefore, not available to set off support obligations.

proper. However, appellant objects to the application of appellee's expenditures for travel and legal fees spent in pursuit of his visitation rights to reduce his arrearage. Appellant suggests that these expenses provided no direct or indirect assistance for the support of the parties' children. Additionally, since these expenditures were made prior to appellee's application for modification, appellant characterizes the trial court's action as a retroactive modification of support of the nature prohibited by R.C. 3113.21(M)(3).

We disagree. The referee's report on this issue is well reasoned. Initially, the referee made a specific finding that it is in the best interest of the parties' children that they have contact and develop a relationship with their father. Next, the trial court specifically found that appellant had deliberately and willfully acted to deny appellee and the children the mutual benefits of companionship. These determinations are supported by the evidence. The referee then reasonably recommended that the funds expended in pursuit of a benefit of the children constituted support for them and could rightly be credited against appellant's arrearage.

We note that there was no modification of the amount which was due prior to appellee's motion. The court's order dealt only with whether certain amounts should be credited to those unamended arrearages. Therefore, appellant's argument that the court's order constituted an impermissible retroactive change of support obligation fails.

■ Additionally, if the funds paid directly to appellant, the legal and travel expenditures, and the completed gifts to the children are summed, the resulting total far exceeds appellee's legal obligation. Given this, it might be considered inequitable had the court not fashioned an order which granted the relief appellee received. In consideration of these factors we cannot say that the trial court's decision on this issue was unreasonable, arbitrary or unconscionable. Accordingly, appellant's second assignment of error is not well taken.

## II

Appellant's first assignment of error is more troublesome. R.C. 3109.05(D) provides:

"(D) The court shall not authorize or permit the escrowing, impoundment, or withholding of any child support payment ordered under this section or any other section of the Revised Code because of a denial of or interference with a right of companionship or visitation granted in an order issued under this section, section 3109.051, section 3109.11, section 3109.12, or any other section of the Revised Code, or as a method of enforcing the specific provisions of any such order dealing with visitation." See, also, R.C. 3113.215(C).

Appellant asserts that the trial court's order suspending appellee's child support obligation is in direct violation of the statute and the legislature's clear intention that "modification or denial of child support not be used either as a mechanism for enforcing visitation orders or punishing the noncomplying custodial parent." *In re Moore* (Mar. 28, 1991), Marion App. No. 9–90–20, unreported, at 7, 1991 WL 44188; accord *Hasey v. Hasey* (Dec. 3, 1991), Mahoning App. No. 90–CA–137, unreported, at 4, 1991 WL 256483.

We are aware of the axiom that "bad facts make bad law." We are also cognizant that this case represents indisputably difficult facts. Appellant's deliberate acts have deprived her children of the companionship, guidance and nurture of their natural father. The trial court equated appellee's reciprocal deprivation with a termination of his parental rights. Additionally, appellant has negated the authority of this or any court in the United States to provide appellee with a remedy for this grievous wrong, yet appellant now asks us to enforce her right to receive support.

Absent the statute, the answer of this court clearly should be that one who refuses to submit to the authority of the court is without standing to invoke that authority. The traditional formulation of this response is the equitable maxim that one who seeks equity must do equity.[2] *McEntire v. McEntire* (1923), 107 Ohio St. 510, 524–525, 140 N.E. 328, 332. Whether that rule still has vitality depends on the role of equity in modern domestic relations matters and the relationship of R.C. 3109.05(D) to that role.

The application of the principles of equity to domestic relations matters, like most of our system of law, came to our jurisprudence from the English system. The peculiarities of American life, however, caused some amendment to the English common law. In England, matters of divorce and annulment were in the province of ecclesiastical courts which were adjunct to the state religion. These courts were distinct from courts of equity. Each developed its own common law. *DeWitt v. DeWitt* (1902), 67 Ohio St. 340, 345–346, 66 N.E. 136, 138. This division continued in British law until the middle of the Nineteenth Century. Clark, The Law of Domestic Relations in the United States (1987) 695.

In America, there was no established state religion and, therefore, no ecclesiastical court. The void was filled with the enactment of statutes to govern domestic relations matters and the adoption of the rules of chancery for governance of these issues. *Id.;* Green, Long & Muransk, Dissolution of Marriage (1986) 12–14; Walker, Ohio Divorce, Annulment and Child Custody (1981) 14–17. There has been some debate as to whether Ohio domestic relations courts were imbued

---

**2.** The maxim is one of the oldest in equity and is closely related to the equitable "clean hands" doctrine. See 41 Ohio Jurisprudence 3d (1983) 370, 373, Equity, Sections 66–67.

with the full mantle of equity. *DeWitt v. DeWitt, supra; McEntire v. McEntire, supra.* This dispute was resolved by the Ohio legislature in 1951 when it enacted G.C. 8003–21, later R.C. 3105.20, which granted "full equity powers and jurisdiction" to common pleas courts in domestic relations matters. *Newell v. Newell* (1970), 23 Ohio App.2d 149, 150, 52 O.O.2d 178, 179, 261 N.E.2d 278, 279.

Following the 1968 Courts Amendment to the Ohio Constitution, the Ohio Rules of Civil Procedure were enacted. See Mulligan & Pohlman, The 1968 Modern Courts Amendment to the Ohio Constitution (1968), 29 Ohio St.L.J. 811. Civ.R. 75(H) gave domestic relations courts the ability to issue certain equitable relief. At the same time the Civil Rules were enacted, the legislature passed Am.Sub.H.B. No. 1201, which repealed statutes that had been superseded by the Civil Rules, including R.C. 3105.20. Even though Am.Sub.H.B. No. 1201 contained a savings clause and Civ.R. 82 specifically provides that the rules are not to be construed to limit the existing jurisdictions of courts, see Browne, Civil Rule 1 and the Principle of Primacy—A Guide to the Resolution of Conflicts Between Statutes and the Civil Rules (1978), 5 Ohio N.U.L.Rev. 363, one court of appeals held that the repeal of R.C. 3105.20 divested Ohio domestic relations courts of any equitable jurisdiction. *Soyk v. Soyk* (1975), 45 Ohio App.2d 319, 322, 74 O.O.2d 532, 534, 345 N.E.2d 461, 464.

The legislature's response was unusually swift. On July 9, 1975, it passed, as an emergency measure, Am.Sub.H.B. No. 370, which created R.C. 3105.011. The statute is brief and curiously constructed, but it clearly states that domestic relations courts have full equitable powers and jurisdiction [3]; it currently remains in effect. Therefore, by both statute and common law, Ohio domestic relations courts have and may exercise authority according to the established rules of equity. A domestic relations court does not then abuse its discretion when it applies equitable rules as it did in this instance to bar appellant from seeking to utilize the authority she refuses to obey.

With respect to R.C. 3109.05(D), the purpose of statutory construction, in every instance, is to ascertain and give effect to the intent of the legislature. *Carter v. Youngstown* (1946), 146 Ohio St. 203, 32 O.O. 184, 65 N.E.2d 63, paragraph one of the syllabus. While it is cardinal in so doing that we look first to the language of the statute itself to determine legislative intent, see *Katz v. Ohio Dept. of Liquor Control* (1957), 166 Ohio St. 229, 231, 2 O.O.2d 54, 55, 141 N.E.2d 294, 295, such construction should avoid absurd and unreasonable results.

---

**3.** "The court of common pleas including divisions of courts of domestic relations, has full equitable powers and jurisdiction appropriate to the determination of all domestic relations matters. This section is not a determination by the general assembly that such equitable powers and jurisdiction do not exist with respect to any such matter."

*State ex rel. Cooper v. Savord* (1950), 153 Ohio St. 367, 41 O.O. 396, 92 N.E.2d 390, paragraph one of the syllabus. For the following reasons, we do not believe it was the intent of the legislature, when it enacted R.C. 3109.05(D), to emasculate Ohio domestic relations courts, deprive a father and his children of their fundamental rights of companionship and nurture, yet force the court to aid one who wantonly disregards its authority.

A split in authority exists among the states as to whether it is appropriate to condition child visitation on the satisfaction of a parent's child support obligation. See Annotation (1981), 8 A.L.R.4th 1231. Although Ohio sometimes has been placed among those jurisdictions disfavoring such practice, *id.;* see, also, *Elkind v. Harding* (1957), 104 Ohio App. 322, 4 O.O.2d 482, 143 N.E.2d 752, historically there has even been a lack of uniformity among Ohio courts on this issue. See *Johnson v. Johnson* (1977), 52 Ohio App.2d 180, 180–182, 6 O.O.3d 170, 170–171, 368 N.E.2d 1273, 1273–1275; *Flynn v. Flynn* (1984), 15 Ohio App.3d 34, 37, 15 OBR 57, 59, 472 N.E.2d 388, 391; and *Porter v. Porter* (1971), 25 Ohio St.2d 123, 54 O.O.2d 260, 267 N.E.2d 299, at paragraph four of the syllabus. In fact, at one point, Ohio law specifically approved the impoundment of support funds due out-of-state custodial parents who violated visitations orders. This came as part of the Ohio version of the Uniform Reciprocal Enforcement of Child Support Act. See former R.C. 3115.21(B) and *Sperry v. Hlutke* (1984), 19 Ohio App.3d 156, 160, 19 OBR 246, 250, 483 N.E.2d 870, 875. For a time, Ohio even had two rules: one for intrastate matters, one for interstate. The Supreme Court of Ohio explained the distinction:

"It is important at this point to distinguish the situation here [interstate] from one wherein the parents are separated but the children are not removed from the state, in which latter case, the respective duties of support on the one hand and of according visitation to the other parent on the other are not interdependent for the reason that they may, and should, be separately enforced.

"Therefore, the correct rule of law applicable to this case is that where a father and his children have been deprived of their rights of visitation with each other by the mother's removal of the children from this state without the father's consent, the trial court may condition the father's duty to support the children upon the mother's compliance with reasonable visitation privileges, unless the mother is unable fully to support the children; or they are wanting for proper care and by reason thereof they are about to become public charges." (Citations omitted.) *Porter v. Porter, supra,* 25 Ohio St.2d at 128–129, 54 O.O.2d at 263–264, 267 N.E.2d at 303. See, also, *Creed v. Schultz* (1983), 148 Cal.App.3d 733, 741–742, 196 Cal.Rptr. 252, 257, applying former Ohio R.C. 3109.05(B).

In 1987, R.C. 3115.21 was amended by Am.Sub.H.B. No. 231, which repealed the portion of the statute that permitted the impoundment of funds.[4] The same bill integrated county bureaus of support with agencies organized under Title IV–D of the "Social Security Act," 88 Stat. 2351, Section 651 *et seq.*, Title 42, U.S.Code, into child support enforcement agencies. In 1990, the legislature enacted Am.Sub.H.B. No. 591. This bill had as its principal purpose the codification of the former Civ.R. 75 child support guidelines. The Act also introduced R.C. 3109.05(D) and 3113.215(D) into the law.

The origin of the statutory prohibition of withholding child support payments to enforce visitation rights is obscure. There is no federal rule under Title IV–D or elsewhere which demands such a statute. To our knowledge, no other state in the Union has such a statute. The revision simply emerges from Am.Sub.H.B. No. 591. It is not even mentioned in the lengthy enumeration of the purposes of the Act which precedes its provisions. The only logical interpretation that we can place on the appearance of this clause is that with the universal enactment of reciprocal support compacts among the states under federal tutelage, the General Assembly determined that a parent willfully deprived of his or her visitation rights had an adequate remedy to enforce those rights through that system. Accordingly, the rationale put forth in *Porter v. Porter* for the disparate treatment between interstate and intrastate cases would no longer be valid.

This rationale dissipates, however, when, as here, the children and their custodial parent are extraterritorial to any of the United States or its territories. Absent the United States child support enforcement mechanism, the *Porter* reasoning again becomes valid. Applied to this matter, we examine the specific trial court findings (1) that appellant took the children out of the reach of American courts with a specific intent to deny appellee and the children their mutual rights of companionship, (2) that the children are being adequately supported, and (3) that it is in the best interest of the children that appellee have the financial resources to pursue his rights of companionship in the English courts. As these findings satisfy the *Porter* criteria, we cannot say that the trial court abused its discretion in suspending appellee's support obligation in that the intent of the statute was satisfied and equity was done. Accordingly, appellant's first assignment of error is not well taken.

On consideration whereof, the court finds substantial justice has been done the party complaining, and the judgment of the Erie County Court of Common Pleas,

---

4. The statute retained a provision which permits suspension of visitation if support obligations are not met. See R.C. 3115.21(B) (eff. Oct. 5, 1987).

Domestic Relations Division, is affirmed. It is ordered that appellant pay the court costs of this appeal.

*Judgment affirmed.*

GLASSER, P.J., and HANDWORK, J., concur.