DEUTSCHE BANK NATIONAL TRUST COMPANY, Trustee, Appellee,

v.

PEVARSKI et al., Appellants; Ameriquest Mortgage Company, Appellee.

[Cite as *Deutsche Bank Natl. Trust Co. v. Pevarski,*
187 Ohio App.3d 455, 2010-Ohio-785.]

Court of Appeals of Ohio,
Fourth District, Washington County.

No. 08CA52.

Decided March 1, 2010.

458

Graydon Head & Ritchey, L.L.P., John C. Greiner, Jeffrey M. Hendricks, and Kara A. Czanik, for appellee.

Bordas & Bordas, P.L.L.C., Jason E. Causey, and James B. Stoneking, for appellants.

Kline, Judge.

{¶ 1} Glenn V. Pevarski and Nanetta L. Pevarski appeal the summary judgment of the Washington County Court of Common Pleas. Deutsche Bank National Trust Company ("Deutsche") filed a claim for foreclosure on the Pevarskis' home. Thereafter, the trial court granted summary judgment in favor of Deutsche and third-party defendant Ameriquest Mortgage Company ("Ameriquest") on Deutsche's foreclosure claim and the Pevarskis' various counterclaims and third-party claims.

{¶ 2} For various reasons, the Pevarskis contend that the trial court improperly granted summary judgment in favor of Deutsche and Ameriquest. First, the Pevarskis argue that genuine issues of material fact exist regarding the equitable defense of unclean hands. We disagree. Under Ohio law, the unclean-hands doctrine relates only to the conduct of plaintiffs. And although Deutsche is the plaintiff in the claim for foreclosure, the Pevarskis' allegations relate only to the conduct of Ameriquest. Therefore, an unclean-hands defense is unavailable because the Pevarskis have not alleged that Deutsche engaged in reprehensible conduct. Second, the Pevarskis argue that genuine issues of material fact exist regarding the defense of unconscionability. Because the agreement between Ameriquest and the Pevarskis is not so outrageous as to be substantively unconscionable, we disagree. Third, the Pevarskis argue that the trial court erred, as a matter of law, in concluding that the parol evidence rule bars the introduction of certain evidence related to the Pevarskis' fraudulent-inducement claims. We disagree. Because the parol evidence rule bars evidence of Ameriquest's alleged promises to the Pevarskis, we find that Deutsche and Ameriquest are entitled to judgment as a matter of law on the Pevarskis' fraudulent-inducement claims. And finally, the Pevarskis argue that genuine issues of material fact exist regarding the Pevarskis' Truth–In–Lending Act ("TILA") claims. We disagree. Because the Pevarskis merely speculate as to whether certain charges were indeed bona fide and reasonable, we find no genuine issues of material fact regarding the Pevarskis' TILA claims.

{¶ 3} After construing the record and all inferences therefrom in the Pevarskis' favor, we find (1) that there is no genuine issue as to any material fact, (2) that Deutsche and Ameriquest are entitled to judgment as a matter of law on the various claims, counterclaims, and third-party claims, and (3) that reasonable minds can come to only one conclusion, and that conclusion is adverse to the Pevarskis. Accordingly, we affirm the judgment of the trial court.

I

{¶ 4} In 2004, the Pevarskis started falling behind on some of their credit-card debts. Glenn Pevarski suffered a spinal cord injury in 2001 and, as a result, was receiving Workers' Compensation benefits of $944 every two weeks. Before the injury, Glenn's income was approximately $36,000 a year plus commission. Nanetta Pevarski was self-employed and earned between $100 and $150 dollars a month.

{¶ 5} The Pevarskis owned their home, which they purchased sometime around 1994. Because they were falling behind on their credit-card debts, the Pevarskis began looking into mortgage refinancing options in early 2004. At the time, the Pevarskis had minimum payments of approximately $453 per month on their credit-card debts. Sometime around April 2004, a loan officer from Ameriquest contacted the Pevarskis. During their initial conversations, Glenn told the loan officer that the Pevarskis wanted an affordable 30–year fixed-rate mortgage that would pay off all of their outstanding debts. After these initial conversations, Glenn gathered financial information and faxed it to Ameriquest. A few days later, the loan officer again contacted Glenn and allegedly told him that Ameriquest could offer the Pevarskis a 30–year fixed mortgage at an interest rate of 5.75 percent. Further, the loan officer allegedly advised the Pevarskis to stop making payments on their other debts because the mortgage refinancing would soon close. It is not clear whether the Pevarskis relied on this advice and actually stopped paying their other debts.

{¶ 6} Ameriquest and the Pevarskis scheduled a closing for May 20, 2004. During the closing, Glenn examined the loan documents and noticed that the loan was different from the terms that he had discussed with the loan officer. Specifically, the loan was at a variable interest rate instead of a fixed rate and did not pay off all of the Pevarskis' outstanding debts. Because of these discrepancies, Glenn called the loan officer during the closing process. According to Glenn, the loan officer said that he had made a mistake, that the loan officer would correct it, and that the Pevarskis should sign the documents anyway. However, the Pevarskis did not sign all of the documents, and the closing was rescheduled for May 24, 2004.

{¶ 7} At the second closing, Glenn again noticed that the loan was at a variable interest rate and did not pay off all of the Pevarskis' outstanding debts. Once again, Glenn called the loan officer. According to Glenn, the loan officer made the following claims during this conversation: (1) that the Pevarskis should not worry about it, (2) that Ameriquest had to "work" the loan that way for now, and (3) that Ameriquest would refinance the loan before the interest rate increased. The Pevarskis claim that they signed the loan documents based on this promise from the loan officer.

{¶ 8} At the time of the refinancing, the Pevarskis owed $107,759 on their first mortgage and $35,188 on their second mortgage. The Pevarskis paid $704 a month on their first mortgage, which had a fixed 6.25 percent interest rate. The second mortgage was a home equity loan with a $121 monthly payment. The terms of the second mortgage are not entirely clear, but it apparently had a variable interest rate. The Pevarskis were current with both of their mortgages at the time of the refinancing.

{¶ 9} The Pevarskis paid over $9,000 in closing costs on the loan from Ameriquest, and the debt secured by the Pevarskis' home increased from $142,947 to $177,300. The loan from Ameriquest had a variable interest rate starting at 6.3 percent and an initial payment of $1,097.44 per month.

{¶ 10} Apparently, representatives from Ameriquest falsified the Pevarskis' financial information during the loan-approval process. The loan application inflates the Pevarskis' monthly income from $2,197 per month to $4,001 per month. The application states that Glenn earned one dollar ($1) a month from his job and that Nanetta earned $4,000 a month in self-employment income. And although the Pevarskis owned just one home worth approximately $197,000, the loan application states that the Pevarskis owned two different houses, worth a combined $394,000, at their single address. Further, the loan application does not apply the Pevarskis' two mortgages against the only actual house on their property. Instead, the loan application lists one of the Pevarskis' mortgages against the actual house and the second mortgage against the nonexistent house. Despite these discrepancies, the Pevarskis claim that they provided accurate information to Ameriquest during the loan-approval process. Ameriquest prepared the loan application, and the Pevarskis did not see the application until closing. The Pevarskis state that they did not closely review the application because they relied on Ameriquest to prepare the application accurately.

{¶ 11} About a week after closing, the loan officer contacted Nanetta and told her that the Pevarskis needed to sign some additional documents. The loan officer then faxed Nanetta two "Profit and Loss" statements that the loan officer had prepared. One of the statements required Nanetta's signature, and the other statement required Glenn's signature. Nanetta claims that she did not understand the contents of the profit-and-loss statements, and Glenn was out of the country at the time. Nevertheless, the loan officer allegedly claimed that Glenn had already approved the signing of the profit-and-loss statements. So Nanetta signed both statements and faxed them back to the loan officer. The next day, the loan officer called back and said that he had made a mistake with the previous day's documents. The loan officer then faxed Nanetta two new profit-and-loss statements. Again, she signed them both and then faxed the statements back to the loan officer. The profit-and-loss statements do not

contain the dates on which they were prepared, the time periods that they supposedly cover, or the names of the Pevarskis' respective businesses. Furthermore, the profit-and-loss statements do not correspond to the incomes listed on the Pevarskis' loan application.

{¶ 12} The Pevarskis continued to have financial troubles and, sometime around October 2005, had to sell their car. Despite their financial troubles, the Pevarskis stayed current on their mortgage with Ameriquest.

{¶ 13} In early 2006, the Pevarskis attempted to refinance their loan in accordance with the loan officer's promise. However, Ameriquest did not refinance the Pevarskis' loan.

{¶ 14} Under the refinancing agreement, the first rate adjustment was to happen in July 2006. According to the Pevarskis' expert witness, "[I]t was completely and irrevocably clear that the applicable interest rate on the loan would increase, and thus the payments had to increase at the first adjustment period." And indeed, the Pevarskis' monthly payment increased to $1,327.96 at the first rate adjustment.

{¶ 15} After the first rate adjustment, Glenn began corresponding with Ameriquest about his dissatisfaction with the company and the Pevarskis' current loan. The Pevarskis did not obtain the desired refinancing from this correspondence, and Ameriquest refused to comment on the alleged promises made by the loan officer.

{¶ 16} In October 2006, the Pevarskis stopped making payments on their mortgage. On December 26, 2006, Deutsche, as holder of the Pevarskis' mortgage note, filed a foreclosure action. The Pevarskis answered and filed several counterclaims against Deutsche. In part, the Pevarskis asserted counterclaims for fraudulent inducement and TILA violations. On February 26, 2007, the Pevarskis filed a third-party complaint asserting fraudulent inducement and TILA claims against Ameriquest. After extensive discovery and competing summary-judgment motions, the trial court granted summary judgment in favor of Deutsche and Ameriquest (and against the Pevarskis) as to all claims, counterclaims, and third-party claims. On December 1, 2007, the trial court entered a journal entry granting Deutsche a judgment and decree of foreclosure.

{¶ 17} The Pevarskis appeal, asserting the following assignment of error: "The trial court erred in sustaining the lenders' motion for summary judgment."

## II

{¶ 18} "Because this case was decided upon summary judgment, we review this matter de novo, governed by the standard set forth in Civ.R. 56." *Comer v. Risko,* 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8.

{¶ 19} Summary judgment is appropriate only when the following have been established: (1) that there is no genuine issue as to any material fact, (2) that the moving party is entitled to judgment as a matter of law, and (3) that reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party. Civ.R. 56(C). See also *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 146, 524 N.E.2d 881; *Morehead v. Conley* (1991), 75 Ohio App.3d 409, 411, 599 N.E.2d 786. In ruling on a motion for summary judgment, the court must construe the record and all inferences therefrom in the opposing party's favor. *Doe v. First United Methodist Church* (1994), 68 Ohio St.3d 531, 535, 629 N.E.2d 402.

{¶ 20} The burden of showing that no genuine issue of material fact exists falls upon the party who moves for summary judgment. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 294, 662 N.E.2d 264, citing *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798. However, once the movant supports his or her motion with appropriate evidentiary materials, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). See also *Dresher* at 294–295, 662 N.E.2d 264.

{¶ 21} In reviewing whether an entry of summary judgment is appropriate, an appellate court must independently review the record and the inferences that can be drawn from it to determine whether the opposing party can possibly prevail. *Morehead*, 75 Ohio App.3d at 411–412, 599 N.E.2d 786. "Accordingly, we afford no deference to the trial court's decision in answering that legal question." Id. at 412, 599 N.E.2d 786. See also *Schwartz v. Bank One, Portsmouth, N.A.* (1992), 84 Ohio App.3d 806, 809, 619 N.E.2d 10.

{¶ 22} In their sole assignment of error, the Pevarskis contend that the trial court erred by granting summary judgment in favor of Deutsche and Ameriquest. The Pevarskis argue that summary judgment was improper for the following reasons: (1) genuine issues of material fact exist regarding the equitable defenses of unclean hands and unconscionability, (2) the trial court erred, as a matter of law, in concluding that the parol evidence rule barred evidence of the statements and promises that Ameriquest made to the Pevarskis in regards to the Pevarskis' fraudulent-inducement claims, and (3) genuine issues of material fact exist regarding the Pevarskis' TILA claims.

## A. Unclean Hands

{¶ 23} Under their sole assignment of error, the Pevarskis argue that genuine issues of material fact exist regarding the equitable defense of unclean hands.

{¶ 24} "[I]t is fundamental that he who seeks equity must do equity, and that he must come into court with clean hands." *Christman v. Christman* (1960), 171 Ohio St. 152, 154, 12 O.O.2d 172, 168 N.E.2d 153. "[F]or the doctrine of unclean hands to apply, the offending conduct must constitute reprehensible, grossly inequitable, or unconscionable conduct, rather than mere negligence, ignorance, or inappropriateness." *Wiley v. Wiley*, Marion App. No. 9–06–34, 2007-Ohio-6423, 2007 WL 4225506, at ¶ 15. Furthermore, "the unclean hands doctrine should not be imposed where a party has legal remedies available to address an opposing party's asserted misconduct." *Safranek v. Safranek*, Cuyahoga App. No. 80413, 2002-Ohio-5066, 2002 WL 31123864, at ¶ 20, citing *Miller v. Miller* (1993), 92 Ohio App.3d 340, 348–349, 635 N.E.2d 384.

{¶ 25} Deutsche argues that the doctrine of unclean hands should not apply because "[t]he Pevarskis do not allege any reprehensible conduct by Deutsche, the current holder of the Note. * * * Rather, the Pevarskis rely on alleged conduct by Ameriquest, the lender." In response, the Pevarskis argue that "this is a distinction without a difference. Ohio law is well settled that a holder takes an instrument subject to all valid defenses. The only exception is if the holder can affirmatively prove that he is [a] holder in due course. * * * This issue was raised in a separate summary judgment motion which the [trial court] *did not reach.* Thus, for purposes of this appeal, we must assume that Deutsche is merely a holder and is subject to all defenses assertable [sic] against Ameriquest." See generally *All Am. Fin. Co. v. Pugh Shows, Inc.* (1987), 30 Ohio St.3d 130, 131–132, 30 OBR 443, 507 N.E.2d 1134 (discussing holder-in-due-course status). However, we are not persuaded by the Pevarskis' argument. By calling Deutsche a "holder," the Pevarskis concede that Deutsche is a "person entitled to enforce" the mortgage note. See R.C. 1303.31(A) (defining the phrase "[p]erson entitled to enforce"). And here, we believe that the Pevarskis' unclean-hands defense fails regardless of Deutsche's status under R.C. 1303.31.

{¶ 26} In Ohio, the maxim of unclean hands "requires *only that the plaintiff* must not be guilty of reprehensible conduct with respect to the subject-matter of his suit." (Emphasis added.) *Kinner v. Lake Shore & Michigan S. Ry. Co.* (1904), 69 Ohio St. 339, 69 N.E. 614, at paragraph one of the syllabus. See also *Townsend v. Townsend*, Lawrence App. No. 08CA9, 2008-Ohio-6701, 2008 WL 5265677, at ¶ 52; *Ellis v. Patonai*, Wayne App. No. 06CA0012, 2006-Ohio-5054, 2006 WL 2788562, at ¶ 21 (stating that "the plaintiff must not be guilty of misconduct with respect to the subject matter of the suit" [citation omitted] ); *Wiley*, 2007-Ohio-6423, 2007 WL 4225506, at ¶ 15. Thus, in *Kinner*, the Supreme Court of Ohio held that the unclean-hands doctrine relates only to the conduct of plaintiffs. Here, although Deutsche is the plaintiff, the Pevarskis have not alleged that Deutsche engaged in reprehensible conduct. The Pevarskis' allega-

tions relate only to the conduct of Ameriquest. Therefore, there are no genuine issues of material fact regarding Deutsche's conduct with respect to the Pevarskis' refinancing agreement.

{¶ 27} Accordingly, the Pevarskis' unclean-hands argument fails regardless of Deutsche's status. Under the law of negotiable instruments, the Pevarskis may not assert an unclean-hands defense against Deutsche. R.C. Chapter 1303 covers negotiable instruments, and R.C. 1303.35 addresses "[d]efenses and claims in recoupment." Particularly, R.C. 1303.35(A)(2) provides: "[T]he right to enforce the obligation of a party to pay an instrument is subject to * * * [a] defense of the obligor set forth in a section of this chapter or a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract." Here, Deutsche is the person entitled to enforce the instrument. And if Deutsche were enforcing a right to payment under a simple contract, the Pevarskis could not assert an unclean-hands defense based on the conduct of a party other than Deutsche. *Kinner*, 69 Ohio St. 339, 69 N.E. 614, precludes the Pevarskis from raising such a defense. Therefore, because it does not meet the criteria of R.C. 1303.35(A)(2), the unclean-hands defense is unavailable to the Pevarskis.

{¶ 28} Accordingly, after applying *Kinner* and R.C. 1303.35(A)(2), the Pevarskis' unclean-hands argument fails as a matter of law.

### B. Unconscionability

{¶ 29} Next, we address the Pevarskis' argument that genuine issues of material fact exist regarding the defense of unconscionability. Initially, we note that "[u]nconscionability of a contract is an affirmative defense to a claim brought on a contract." *St. Vincent Charity Hosp. v. Eget* (Mar. 26, 1987), Cuyahoga App. No. 52242, 1987 WL 8590, *2, citing *Williams v. Walker–Thomas Furniture* (C.A.D.C.1965), 350 F.2d 445. See also *Breeding v. Fireman's Fund Am. Life Ins. Co.* (1985), 27 Ohio App.3d 81, 85, 27 OBR 101, 499 N.E.2d 890 ("Unconscionability may provide a defense to enforcement of an executed contract"). Here, if Deutsche were enforcing a right to payment under a simple contract, the Pevarskis could assert an unconscionability defense. Therefore, unlike an unclean-hands defense, an unconscionability defense is available to the Pevarskis under 1303.35(A)(2).

{¶ 30} Absent unconscionability, Ohio courts have held the concept of freedom of contract to be fundamental to our society. *Dorsey v. Contemporary Obstetrics & Gynecology, Inc.* (1996), 113 Ohio App.3d 75, 80, 680 N.E.2d 240. " 'Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. Whether a meaningful

choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction. In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power.' " *Orlett v. Suburban Propane* (1989), 54 Ohio App.3d 127, 129, 561 N.E.2d 1066, quoting *Williams*, 350 F.2d at 449. See also *Beneficial Mtg. Co. of Ohio v. Leach*, Franklin App. No. 01AP–737, 2002-Ohio-2237, 2002 WL 926759, at ¶ 56; *Dorsey* at 80, 680 N.E.2d 240. "The purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise." *Leach* at ¶ 56, citing J. Calamari & J. Perillo, Contracts (3d Ed.1987) 406, Section 9–40.

{¶ 31} "Because the determination of whether a contract is unconscionable is a question of law for the court, a factual inquiry into the particular circumstances of the transaction in question is required." (Citations omitted.) *Eagle v. Fred Martin Motor Co.*, 157 Ohio App.3d 150, 2004-Ohio-829, 809 N.E.2d 1161, at ¶ 13. See generally *Renken Ents. v. Klinck*, Trumbull App. No. 2004–T–0084, 2006-Ohio-1444, 2006 WL 766561, at ¶ 15–24 (examining unconscionability in a summary-judgment context); *Leach* at ¶ 56–74 (examining the unconscionability of a mortgage-refinancing agreement in a summary-judgment context). "Generally, contracts or clauses thereof are 'unconscionable' where one party has been misled as to the 'basis of the bargain,' where a severe imbalance in bargaining power exists, or where specific contractual terms are outrageous." *Orlett* at 129, 561 N.E.2d 1066, citing *Cty. Asphalt, Inc. v. Lewis Welding & Engineering Corp.* (S.D.N.Y.1970), 323 F.Supp. 1300, 1308; see also *Hall v. Woodland Lake Leisure Resort Club, Inc.* (Oct. 15, 1998), Washington App. No. 97CA945, 1998 WL 729197. "The unconscionability doctrine consists of two prongs: '(1) substantive unconscionability, *i.e.*, unfair and unreasonable contract terms, and (2) procedural unconscionability, *i.e.*, individualized circumstances surrounding parties to a contract such that no voluntary meeting of the minds was possible.' " *Leach*, 2002-Ohio-2237, 2002 WL 926759, at ¶ 57, quoting *Dorsey*, 113 Ohio App.3d at 80, 680 N.E.2d 240. "These two concepts create what is, in essence, a two-prong test of unconscionability. One must allege and prove a 'quantum' of both prongs in order to establish that a particular contract is unconscionable." *Collins v. Click Camera & Video, Inc.* (1993), 86 Ohio App.3d 826, 834, 621 N.E.2d 1294.

{¶ 32} " 'Substantive unconscionability involves those factors which relate to the contract terms themselves and whether they are commercially reasonable. Because the determination of commercial reasonableness varies with the content of the contract terms at issue in any given case, no generally accepted list of factors has been developed for this category of unconscionability.' " *Hall*, 1998 WL 729197, *8, quoting *Click Camera* at 834, 621 N.E.2d 1294. However, " '[i]n determining reasonableness or fairness, the primary concern must be with the terms of the contract considered in light of the circumstances existing when

the contract was made. The test is not simple, nor can it be mechanically applied. * * * Corbin suggests the test as being whether the terms are "so extreme as to appear unconscionable according to the mores and business practices of the time and place." 1 Corbin, [Contracts (1863) Section 128, Note 2].' " *Leach*, 2002-Ohio-2237, 2002 WL 926759, at ¶ 60, quoting *Williams*, 350 F.2d at 450.

{¶ 33} The Pevarskis rely on *Leach* in support of their substantive-unconscionability argument. In *Leach*, 2002-Ohio-2237, 2002 WL 926759, the Tenth District Court of Appeals found a genuine issue of material fact as to whether a mortgage-refinancing agreement was substantively unconscionable. The *Leach* court based its decision, in part, on the following factors: (1) the increase in the defendant's total monthly payments after the refinancing, (2) the increased interest rates under the refinancing agreement, and (3) the fact that the lender's financial position improved significantly while the defendant's financial position markedly declined. *Leach* at ¶ 64–70. The Pevarskis contend that their agreement with Ameriquest is similar to the agreement in *Leach*. Therefore, the Pevarskis claim that they have raised a genuine issue of material fact regarding substantive unconscionability. However, for the following reasons, we find the present case to be distinguishable from *Leach*.

{¶ 34} First, the Pevarskis' combined monthly payments did not increase immediately after refinancing. In *Leach*, the defendant's total monthly payments increased from $1,394 before the refinancing agreement to $1,718 after refinancing. Id. at ¶ 66. However, the Pevarskis' refinancing agreement lowered their total monthly debt payments by approximately $181 a month for two years, for a total savings of approximately $4,344. Thus, while the Pevarskis' monthly payment did eventually rise, it did not rise immediately like the payment did in *Leach*. Moreover, the two years of savings allowed the Pevarskis time to, hopefully, straighten out their finances. This result does not seem unconscionable to us.

{¶ 35} Next, we cannot say that the Pevarskis' financial position "markedly declined" after the refinancing. Here, the Pevarskis received $25,277 in cash at closing. In contrast, the defendant in *Leach* received no direct funds from her refinancing agreement. See *Leach*, 2002-Ohio-2237, 2002 WL 926759, at ¶ 80. Granted, the debt secured by the Pevarskis' home increased from $142,947 to $177,300, which is a greater amount than was refinanced by the defendant in *Leach*. In *Leach*, the debt secured by the defendant's home increased from $111,785 to $125,600. *Leach* at ¶ 2, 62. Thus, because the defendant in *Leach* refinanced a lesser amount, we would not expect that she received as much as the Pevarskis did at closing. Nevertheless, under the totality of the circumstances, we find the cash-at-closing differences between the present case and *Leach* to be

significant. The defendant in *Leach* (1) refinanced a lesser amount than the Pevarskis, (2) received no money at closing, and (3) saw an *immediate increase* of $324 in her total monthly payments. In contrast, the Pevarskis (1) refinanced a greater amount than the defendant in *Leach*, (2) received $25,277 at closing, and (3) saw an *immediate decrease* in their total monthly debt payments.

{¶ 36} The agreement between Ameriquest and the Pevarskis cannot be as outrageous as the agreement in *Leach* because the Pevarskis received two things that the defendant in *Leach* did not. That is, the Pevarskis received more money at closing and lower monthly payments (at least initially). Thus, we find the Pevarskis' refinancing agreement more financially beneficial for the borrowers than was the agreement in *Leach*.

{¶ 37} Finally, the Pevarskis' interest rate did not increase to the levels of the interest rate in *Leach*. The defendant in *Leach* had a nine percent interest rate before refinancing. "After the refinance, [the *Leach*] defendant had a home financing agreement with an initial rate of fourteen percent, variable up to twenty-one percent, despite apparent assurances of [the lender's] employee that he would secure defendant a rate lower than her nine percent mortgage rate." Id., 2002-Ohio-2237, 2002 WL 926759, at ¶ 68.

{¶ 38} Here, the Pevarskis' interest rate rose, but it never approached 14 percent. Under the refinancing agreement, the Pevarskis started at a 6.3 percent "teaser" rate. However, by January 2008, the Pevarskis' interest rate had risen to 11.125 percent. To be sure, we appreciate that this represents a dramatic increase. Regardless, it is nowhere near the interest rate in *Leach*. And as the *Leach* court said, "a mortgage interest rate of fourteen percent is not, in and of itself, 'so extreme as to appear unconscionable according to the mores and business practices of the time and place.'" (Citation omitted.) *Leach*, 2002-Ohio-2237, 2002 WL 926759, ¶ 67. Instead, the *Leach* court found that "the interest rate and *the other terms of the transaction* are so unreasonably favorable to [the lender] as to be unconscionable." (Emphasis added.) Id. In the present case, an interest rate of 6.3 percent or 11.125 percent is also not, in and of itself, so extreme as to appear unconscionable. And as we have discussed, the other terms of this transaction differ from the terms of the transaction in *Leach*. That is, here, the other terms are not as "unreasonably favorable" to Ameriquest.

{¶ 39} For the foregoing reasons, we find *Leach* to be distinguishable. "Substantive unconscionability 'arises from overly burdensome or punitive terms of a contract.'" *Wixom v. Union Sav. Bank*, 165 Ohio App.3d 765, 2006-Ohio-1216, 848 N.E.2d 569, at ¶ 13, quoting *Information Leasing Corp. v. GDR Invests., Inc.*, 152 Ohio App.3d 260, 2003-Ohio-1366, 787 N.E.2d 652, at ¶ 20. Here, as a matter of law, we cannot find that the terms of the agreement are either overly burdensome or punitive. Similarly, we cannot find that the Pevar-

skis' refinancing agreement is so extreme as to appear unconscionable according to the mores and business practices of the time and place. Indeed, the Pevarskis received several benefits from their agreement with Ameriquest. First, the Pevarskis received money to pay down their higher-interest, unsecured debt. Second, the Pevarskis received lower payments (at least for a while). And finally, the Pevarskis received time and flexibility to, hopefully, improve their financial situation and stave off bankruptcy. These are benefits that the Pevarskis received, and those benefits must come at some cost. For the Pevarskis, that cost was a greater amount of secured debt and, after a while, higher monthly payments.

{¶ 40} To be certain, we sympathize with the Pevarskis' plight. The Pevarskis found themselves in a tough situation and tried to find a way out. Unfortunately, the Pevarskis' agreement with Ameriquest amounted to a "bad deal." However, courts may not invalidate every bad deal on the grounds of unconscionability. And here, we do not believe that the terms of the refinancing agreement are so outrageous as to be unconscionable. Therefore, even after construing the record in the Pevarskis' favor, we find that the Pevarskis have failed to raise a genuine issue of material fact as to substantive unconscionability. As a matter of law, the agreement between Ameriquest and the Pevarskis is not substantively unconscionable.

{¶ 41} Because the Pevarskis have failed to raise a genuine issue of material fact regarding substantive unconscionability, we need not address the Pevarskis' arguments regarding procedural unconscionability. As we noted earlier, "[o]ne must allege and prove a 'quantum' of both prongs in order to establish that a particular contract is unconscionable." *Click Camera*, 86 Ohio App.3d at 834, 621 N.E.2d 1294. Here, the Pevarskis have failed to raise a genuine issue of material fact regarding one of the prongs. Therefore, the Pevarskis' unconscionability argument is without merit.

### C. The Pevarskis' Fraudulent–Inducement Counterclaim and Third–Party Claim

{¶ 42} Under their sole assignment of error, the Pevarskis also make an argument related to their fraudulent-inducement claims. The Pevarskis claim that the loan officer promised to refinance the loan at more favorable terms within two years. The Pevarskis contend that (1) this promise rises to the level of fraudulent inducement and (2) the trial court erred in concluding that the parol evidence rule bars evidence of the loan officer's alleged promise.

{¶ 43} The elements of fraudulent misrepresentation are (1) a representation or, when there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity,

or with such utter disregard as to whether it is true or false that such knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) with justifiable reliance on the misrepresentation or concealment, and (6) an injury proximately caused by that reliance. See *Gaines v. Preterm–Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 55, 514 N.E.2d 709; *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, at paragraph two of the syllabus. The elements of fraudulent inducement are essentially the same. See *Countrymark Coop., Inc. v. Smith* (1997), 124 Ohio App.3d 159, 171–172, 705 N.E.2d 738; *Metro. Life Ins. Co. v. Triskett Illinois, Inc.* (1994), 97 Ohio App.3d 228, 235, 646 N.E.2d 528; *Harrel v. Solt* (Dec. 27, 2000), Pickaway App. No. 00CA027, 2000 WL 33226302.

{¶ 44} Here, we find that the parol evidence rule bars evidence of the loan officer's alleged promise in relation to the Pevarskis' fraudulent-inducement claims. When the parties have entered into a completely integrated written contract, the parol evidence rule prohibits extrinsic evidence, including alleged prior oral agreements, that contradicts the written document. See *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 440, 662 N.E.2d 1074. Thus, " 'an oral agreement cannot be enforced in preference to a signed writing which pertains to exactly the same subject matter, yet has different terms.' " Id., quoting *Marion Prod. Credit Assn. v. Cochran* (1988), 40 Ohio St.3d 265, 533 N.E.2d 325, at paragraph three of the syllabus. "The rule prohibits a party to a written contract from varying, contradicting, or adding to the terms of the written contract with evidence of prior or contemporaneous agreements, either written or oral." *Worthington v. Speedway SuperAmerica L.L.C.*, Scioto App. No. 04CA2938, 2004-Ohio-5077, 2004 WL 2260501, at ¶ 16, citing *Ed Schory & Sons* at 440, 662 N.E.2d 1074.

{¶ 45} "The parol evidence rule derives from the corollary principle of 'contract integration,' which provides that a written contract which appears to be complete and unambiguous on its face will be presumed to embody the final and complete expression of the parties' agreement." *Fontbank, Inc. v. CompuServe, Inc.* (2000), 138 Ohio App.3d 801, 808, 742 N.E.2d 674. See also *TRINOVA Corp. v. Pilkington Bros., P.L.C.* (1994), 70 Ohio St.3d 271, 275, 638 N.E.2d 572. "To say that a contract is integrated means that a court will presume that a complete and unambiguous written contract embodies the parties' final and complete agreement. The presumption is strongest when the written agreement contains a merger or integration clause expressly indicating that the agreement constitutes the parties' complete and final understanding regarding its subject matter." (Citation omitted.) *Worthington*, 2004-Ohio-5077, 2004 WL 2260501, at ¶ 17, citing *Fontbank* at 808, 742 N.E.2d 674. Thus, if the contract is integrated, "evidence of prior or contemporaneous agreements or negotiations is not admissi-

ble \* \* \* to contradict a term of the writing." Restatement of the Law 2d, Contracts (1981), Section 215. See also *TRINOVA* at 275, 638 N.E.2d 572; *Charles A. Burton, Inc. v. Durkee* (1952), 158 Ohio St. 313, 49 O.O. 174, 109 N.E.2d 265, at paragraph two of the syllabus ("Where parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, the parol evidence rule excludes from consideration evidence as to other oral promises resulting from such negotiations").

{¶ 46} In *Cochran*, the Supreme Court of Ohio held that the parol evidence rule "may not be overcome by a fraudulent inducement claim which alleges that the inducement to sign the writing was a promise, the terms of which are directly contradicted by the signed writing." *Cochran*, 40 Ohio St.3d 265, 533 N.E.2d 325, at paragraph three of the syllabus. See also *Galmish v. Cicchini* (2000), 90 Ohio St.3d 22, 29, 734 N.E.2d 782 and fn. 2 (explaining that *Cochran* actually involved the parol evidence rule as opposed to the statute of frauds); *Rice v. Rice*, Columbiana App. No. 2001–CO–28, 2002-Ohio-3459, 2002 WL 1483890, at ¶ 30 ("The Ohio Supreme Court itself mistakenly referred to the Statute of Frauds in *Cochran* \* \* \* when it was actually analyzing the parol evidence rule"). Thus, based on the clear holding in *Cochran*, we find that the parol evidence rule bars evidence of the loan officer's alleged promise in relation to the Pevarskis' fraudulent-inducement claims.

{¶ 47} The Pevarskis argue that *Cochran* is bad public policy and that this court should revisit the case. "Obviously, this Court is bound by Ohio Supreme Court decisions." *Smith v. Cooper*, Gallia App. No. 04CA12, 2005-Ohio-2979, 2005 WL 1400032, at ¶ 9. Therefore, until the Supreme Court of Ohio itself chooses to revisit the case, we must apply the holding in *Cochran*, 40 Ohio St.3d 265, 533 N.E.2d 325.

{¶ 48} In the alternative, the Pevarskis argue that the terms of the loan do not contradict the loan officer's alleged promise. Instead, the Pevarskis claim that the loan officer's promise is extrinsic to the written contract and relates to a "*new and entirely separate loan at some point in the future.* \* \* \* [T]he written contracts governed the loan at issue here – but not the making of any future loan." We are not persuaded. The contract's integration clause provides: "Oral agreements, promises or commitments to lend money, extend credit, or forbear from enforcing repayment of a debt, including promises to extend, modify, renew or waive such debt, are not enforceable. This written agreement contains all the terms the Borrower(s) and the Lender have agreed to." Clearly, the plain language of the integration clause specifically contemplates this type of situation. The Pevarskis claim that the loan officer's promise to refinance (lend money) within two years induced them into entering into the mortgage agreement. But

the integration clause states that "promises or commitments to lend money * * * are not enforceable." Thus, the integration clause contradicts the loan officer's alleged promise to refinance the Pevarskis' mortgage within two years.

{¶ 49} Additionally, to demonstrate that the loan officer's alleged promise is within the scope of the refinancing agreement, Deutsche and Ameriquest cite *Bankers Trust Co. ex rel. Salomon Bros. Mtge. Secs. VII, Inc. v. Harry H. Wagner & Son, Inc.* (Dec. 28, 2001), Allen App. Nos. 1–01–17 through 1–01–40 (except 1–01–27), 2001 WL 1662087. In *Bankers Trust,* the Third District Court of Appeals addressed a fraudulent-inducement claim with a fact pattern similar to that of the present case. The appellants wanted "to enter evidence of an alleged conversation wherein [the bank representative] assured [the company president] that he would be able to refinance the loan within twelve months of the date the promissory notes were executed down to an annual percentage rate of seven to eight percent. The final written agreements, however, do not contain a provision guaranteeing refinancing in six to twelve months at a lower rate. * * * The appellants do not challenge the integrity of the notes as a final integration of the terms of the lending agreement. Rather, the appellants explicitly maintain that [the bank representative's] oral representation to [the company president] created a contract that is purely collateral, distinct and independent of the written contract." *Bankers Trust.*

{¶ 50} However, the court held that "[t]he alleged promise, to reduce the interest rate from 10.9 percent to seven or eight percent, is not separate, distinct, or independent of the final written agreement. The substance of the alleged oral promise is clearly within the scope of the integrated agreements. The terms of the alleged oral promise are terms which, if they existed, would have been incorporated into the promissory notes. In such a situation, the parol evidence rule prevents the appellants from presenting evidence which tends to contradict the terms of the promissory notes." Id.

{¶ 51} The Pevarskis raise several arguments as to why we should not follow *Bankers Trust* in the present case. However, the Pevarskis have not cited a single Ohio case that either supports their arguments or contradicts *Bankers Trust.* As contrary authority, the Pevarskis point to *Carver v. Discount Funding Assoc., Inc.* (June 10, 2004), Huron C.P. No. CVH 20040126, 2004 WL 2827229. But *Carver* is not relevant to the present case because *Carver* does not address the parol evidence rule. Regardless, although we are not bound to follow *Bankers Trust,* we find the reasoning of that case persuasive. Therefore, we choose to follow *Bankers Trust,* 2001 WL 1662087, and find that the loan officer's alleged promise is within the scope of the integrated agreement between Ameriquest and the Pevarskis.

{¶ 52} For the foregoing reasons, we find that the Pevarskis may not introduce evidence of the loan officer's alleged promise in relation to their fraudulent-inducement claims. The parol evidence rule bars such evidence. Accordingly, Deutsche and Ameriquest are entitled to judgment as a matter of law on the Pevarskis' fraudulent-inducement counterclaim and third-party claim.

### D. The Pevarskis' TILA Counterclaim and Third–Party Claim

{¶ 53} Under their sole assignment of error, the Pevarskis also argue that genuine issues of material fact exist regarding their TILA claims.

{¶ 54} The purpose of the TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." Section 1601(a), Title 15, U.S.Code. "To achieve this goal, the [TILA] requires creditors to provide certain disclosures to consumers concerning the terms and cost of a credit transaction." *Grimm v. USLife Credit Life Ins. Co.* (May 19, 1999), Auglaize App. No. 2–98–35, 1999 WL 378376, citing Section 226.1(a), Title 12, C.F.R.

{¶ 55} Under the TILA, "[t]he failure to clearly disclose a finance charge * * * automatically triggers liability." *Ferrari v. Howard,* Cuyahoga App. No. 77654, 2002-Ohio-3539, 2002 WL 1500414, at ¶ 21. The finance charge "includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or [as] a condition of the extension of credit." Section 226.4(a), Title 12, C.F.R. However, pursuant to Section 226.4(c)(7)(i), "[t]he following charges are not finance charges: * * * in a transaction secured by real property or in a residential mortgage transaction, if the fees are bona fide and reasonable in amount: (i) Fees for title examination, abstract of title, title insurance, property survey, and similar purposes." The Pevarskis argue that certain charges were not bona fide and reasonable and, as such, should have been included in the finance charge. First, the Pevarskis contend that the terms "title search" and "title examination" are duplicative and describe the same service. And because the HUD statement lists charges for both a "Title Search" and a "Title Examination," the Pevarskis claim that they were essentially "double billed." And second, although the HUD statement lists a $50 charge for a "Title Update," the Pevarskis contend that there is no evidence that the title company actually performed such a service.

### 1. The Title Search and Title Examination

{¶ 56} The Pevarskis claim that "[t]he terms 'examination' and 'search' are synonymous in the industry. * * * [And therefore,] the Pevarskis were

charged twice for what readily appears to be the same service." However, the Pevarskis' claim has no merit. Although in a different context, the Supreme Court of Ohio described the difference between a title search and a title examination in *Dayton Bar Assn. v. Lender's Serv., Inc.* (1988), 40 Ohio St.3d 96, 532 N.E.2d 120. As the court explained, "The distinction between these activities was set out as early as 1930 in Thompson, Abstracts and Titles (2d Ed.) 1036–1037, Section 810, and remains a useful guide today: 'The work of the lawyer who searches the various public offices in which the records affecting title to real estate are found in order to determine the ownership and condition of a particular tract of land may properly be termed an "examining of the title." On the other hand, the person who searches the records with no other object than to note down in more or less brief form the instruments and proceedings found therein and to use the same in making up the abstract, his work is more properly called "searching the title." He does not study the facts discovered by his search for their legal effect on the title. While he examines or reads the records and prepares a digest of their contents, his work is more or less mechanical. * * * [W]here his work does not include the rendering of an opinion as to the validity of the title as disclosed by his search, he can not properly be termed a "title examiner." While the abstract is the result of a careful and accurate "examination" of the records, together with the instruments found recorded therein, the process, taken as a whole, must be distinguished from the examination conducted by one learned in the law and whose duty it is to render an opinion as to the validity of the title.'" Id. at 99, 532 N.E.2d 120. Therefore, we cannot agree that the terms "title search" and "title examination" are synonymous.

{¶ 57} Additionally, the Pevarskis contend that there is no evidence that the title company actually performed both a title search and a title examination. The Pevarskis argue that the title company's file supports this argument. We note that there is some debate as to whether the title company's file is properly in the record on appeal. However, we need not decide this issue because, even if the title company's file is in the record, the Pevarskis offer nothing more than speculation regarding their TILA claims.

{¶ 58} According to the Pevarskis, the title company's file "reflects that only one title search or exam was performed." However, this statement is not accurate. A review of the title company's file shows that the title company received an order from Ameriquest on May 13, 2004. The file also contains an abstract; i.e., the results of the title search. The abstract states that the title search is current as of May 17, 2004. And finally, the title company submitted an "Exam Order Form" to an outside company. Although the title company's exam order form is not dated, the title company appears to have faxed the form on May

18, 2004. Moreover, the outside company apparently received the form on that date.

{¶ 59} Thus, the title company's file contains evidence that both a title search and a title examination were performed in relation to the Pevarskis' refinancing. The Pevarskis have offered no evidence to the contrary. Instead, their argument rests solely on the following: (1) the incorrect belief that the terms "title search" and "title examination" are synonymous and (2) mere speculation that the title company did not actually undertake both a title search and a title examination. However, "[m]ere speculation or possibility is not enough to defeat a summary judgment motion." *Allstate Ins. Co. v. Sears,* Belmont App. No. 06 BE 10, 2007-Ohio-4977, 2007 WL 2758700, at ¶ 74. See also *Blackwell v. Farmers Ins. Exchange,* Pickaway App. No. 05CA3, 2005-Ohio-3499, 2005 WL 1595246, at ¶ 48 ("Speculation is not sufficient to overcome a properly supported summary judgment motion").

## 2. The Title Update

{¶ 60} The Pevarskis also claim that there is no evidence that the title company actually performed a title update. Initially, we note that the Pevarskis did not specifically mention the $50 title-update charge in their summary-judgment arguments below. Instead, in their summary-judgment arguments below, the Pevarskis mentioned the following charges: (1) the aforementioned title search and title examination fees, (2) a title insurance fee of $970.26, (3) a courier fee of $180, and (4) a shipping and handling fee of $40. The Pevarskis first discussed the title-update charge in their motion for reconsideration, which the Pevarskis filed after the court had granted Deutsche's summary-judgment motion. Therefore, on appeal, the Pevarskis have waived any arguments related to the title-update charge. See *McVey v. Carthage Twp. Trustees,* Athens App. No. 04CA44, 2005-Ohio-2869, 2005 WL 1367462, at ¶ 6 ("Our review of the record reveals that the [appellants] failed to raise these arguments in * * * their motion for summary judgment; therefore, they have waived them for purposes of appeal").

{¶ 61} However, even if the Pevarskis had not waived their title-update arguments, we would still find for Deutsche and Ameriquest on the Pevarskis' TILA claims. The Pevarskis have not offered any evidence related to the title-update charge. Instead, the Pevarskis merely speculate that the title company did not actually perform a title update. And as we have already stated, "Speculation is not sufficient to overcome a properly supported summary judgment motion." *Blackwell,* 2005-Ohio-3499, 2005 WL 1595246, at ¶ 48.

{¶ 62} Accordingly, for the foregoing reasons, we find that the Pevarskis have failed to raise any genuine issues of material fact regarding their TILA claims. Therefore, we find that Deutsche and Ameriquest are entitled to judgment as a matter of law on the Pevarskis' TILA counterclaim and third-party claim.

### III

{¶ 63} After construing the record and all inferences therefrom in the Pevarskis' favor, we find (1) that there is no genuine issue as to any material fact, (2) that Deutsche and Ameriquest are entitled to judgment as a matter of law on the various claims, counterclaims, and third-party claims, and (3) that reasonable minds can come only to one conclusion, and that conclusion is adverse to the Pevarskis.

{¶ 64} First, Deutsche is entitled to judgment as a matter of law on its foreclosure claim. The Pevarskis may not assert an unclean-hands defense based on the conduct of Ameriquest. And because the Pevarskis have failed to raise a genuine issue of material fact regarding Deutsche's conduct, the Pevarskis' unclean-hands defense fails as a matter of law. Further, we find no genuine issues of material fact related to substantive unconscionability. That is, the terms of the agreement between Ameriquest and the Pevarskis are not so outrageous as to be substantively unconscionable. Thus, the Pevarskis' unconscionability defense fails as a matter of law.

{¶ 65} We also find that Deutsche and Ameriquest are entitled to judgment as a matter of law on the Pevarskis' counterclaims and third-party claims. In relation to the Pevarskis' fraudulent-inducement claims, we find that the parol evidence rule bars evidence of the loan officer's alleged promise. And in relation to their TILA claims, the Pevarskis have failed to raise any genuine issues of material fact.

{¶ 66} Based on the foregoing, the trial court did not err by granting summary judgment in favor of Deutsche and Ameriquest as to all claims, counterclaims, and third-party claims. Accordingly, we overrule the Pevarskis' sole assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

ABELE, J., concurs.

HARSHA, J., dissents.