[Cite as *Monroe Excavating, Inc. v. DJD&C Dev., Inc.*, 2011-Ohio-3169.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| MONROE EXCAVATING, INC., | ) | |
| | ) | CASE NO. 10 MA 12 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| DJD&C DEVELOPMENT INC., et al., | ) | |
| | ) | |
| DEFENDANTS-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:      Civil Appeal from Common Pleas
                               Court, Case No. 07 CV 2305.

JUDGMENT:                      Affirmed.

APPEARANCES:
For Plaintiff-Appellee:        Attorney Kathryn A. Vadas
                               Attorney Peter B. Grinstein
                               Nadler, Nadler & Burdman Co. LPA
                               20 West Federal Street, Suite 600
                               Youngstown, OH 44503


For Defendants-Appellant:      Attorney Stuart A. Strasfeld
                               Roth, Blair, Roberts, Strasfeld & Lodge
                               100 Federal Plaza East, Suite 600
                               Youngstown, OH 44503-1893


JUDGES:
Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Joseph J. Vukovich


                               Dated: June 17, 2010

DeGenaro, J.

**{¶1}** Appellant, Ridgely Park, LLC appeals the December 23, 2009 decision of the Mahoning County Court of Common Pleas, which held that Ridgely Park was in breach for nonpayment of excavation services pursuant to an oral contract with appellee, Monroe Excavating, Inc., and awarded $44,121.22 in damages.

**{¶2}** Ridgely Park argues that the trial court erred by finding that the April 18, 2006 written proposal by Monroe Excavating did not constitute the contract between the parties, and relying on parol evidence to determine the terms of their agreement. Ridgely Park further asserts that many of the trial court's findings were against the manifest weight of the evidence, and specifically argues that Ridgely Park did not waive the written contract's term that all modifications must be in writing, that Ridgely Park did not otherwise orally authorize Monroe Excavating to bill for additional work on an hourly basis, that Ridgely Park did not authorize Monroe Excavating to deviate from Ohio Department of Transportation specifications, that Monroe Excavating should have borne the costs of remedial work, and that Monroe Excavating did not prove the reasonableness of its additional expenses.

**{¶3}** The April 18, 2006 proposal did not constitute the final agreement between the parties, and was merely an offer by Monroe Excavating, which Ridgely Park rejected by introducing an oral counter offer with different terms. The final agreement between the parties was not memorialized in writing. Thus, the use of parol evidence to determine the terms of the oral contract was proper, and a requirement for written modifications would not have applied. There was some competent credible evidence indicating that Ridgely Park instructed Monroe Excavating to use some materials that were not compliant with ODOT specifications, that certain unforeseen conditions required additional work and materials, that Ridgely Park authorized Monroe Excavating to bill on an hourly basis due to Ridgely Park's repeated design changes as well as the remedial and additional work, and that Monroe Excavating's additional expenses were reasonable.

**{¶4}** Accordingly, the trial court reached a proper legal conclusion regarding the existence of an express oral contract between the parties, and its factual findings were

not against the manifest weight of the evidence. Accordingly, the trial court's decision is affirmed.

## Facts and Procedural History

{¶5} Monroe Excavating filed a complaint for breach of contract and other related theories, and foreclosure of mechanic's lien and action on bond, naming Ridgely Park, DJD&C Development, Inc., and Butler Wick Trust Co. as defendants. Monroe Excavating is an excavating company, DJD&C is a general contractor, Ridgely Park is a real estate development company, and Butler Wick is the financial institution that issued the irrevocable letter of credit on behalf of Ridgely Park for Monroe Excavating's lien. Monroe Excavating alleged that Ridgely Park and DJD&C had breached the contract by failing to pay for certain excavation services rendered. Monroe Excavating prayed for $56,750.77 in damages, a 1.5% per month finance charge, as well as interest, costs and attorney fees.

{¶6} Ridgely Park, Butler Wick and DJD&C filed answers denying all allegations and asserting a number of defenses. After a number of continuances, status conferences, two unsuccessful mediation conferences, discovery and a number of depositions, a three-day bench trial was held before a magistrate.

{¶7} Appearing to testify on behalf of Monroe Excavating were John Monroe, an owner of Monroe Excavating; Robert Burt and Steve Bokry, laborers for Monroe Excavating; Sam Sowards and James Mahoney, employees of the Western Reserve Land Consultants Company, which designed the residential development at issue; Charles Masters, an accountant with experience in road development; and William Davis, an experienced excavator. Appearing to testify on behalf of Ridgely Park were David Kosec, co-manager for Ridgely Park; Dominic Marchionda, president and owner of DJD&C, and co-owner and co-manager of Ridgely Park; and William Gaffney, a civil engineer and manager of an excavation company.

{¶8} The subject of the contract between the parties is a residential housing development, called Ridgely Park. The property was initially owned by Robeson Land Company, LLC. Robeson later joined with Marchionda Land Company, LLC on February

24, 2006 to form the entity Ridgely Park, LLC as the owner of the property. Dominic Marchionda was initially the managing officer of Ridgely Park, and became co-manager with David Kosec around March of 2006.

{¶9} Marchionda began to solicit contractors' bids for the development in 2005, one of which was from John Monroe of Monroe Excavating (Proposal 167). Monroe Excavating's estimate was for the building of a roadway, drainage system, and a detention pond, pursuant to the measurements and estimates in the design plans, drawn by Western Reserve Land Consultants. Monroe testified that he and Marchionda walked through the development together and discussed costs and soil conditions. Marchionda did not recall meeting with Monroe at that time.

{¶10} Pursuant to discussions between the parties, Monroe Excavating submitted a second proposal on February 21, 2006. The second proposal (Proposal 177) included additional services, such as the installation of erosion protection. Subsequent to Kosec's appointment as a co-manager of Ridgely Park, and further discussions among Monroe, Kosec and Marchionda, Monroe Excavating submitted a third proposal (Proposal 187) on April 18, 2006, which included various adjustments in the pricing and planning for the roadway, drainage, detention pond, and erosion protection. Proposal 187 bore Monroe's signature, included a no-oral-modification clause, and indicated that Ridgely Park should sign the proposal if it accepted its terms. No representative of Ridgely Park ever signed the proposal.

{¶11} After the submission of Proposal 187, Ridgely Park orally informed Monroe Excavating that it had reduced the size of the project from 35 to 21 lots, due to cost considerations. Additionally, Ridgely Park chose other companies to perform some of the tasks included in Proposal 187. Monroe Excavating did not submit another written proposal to reflect the changes made. Monroe Excavating began its performance around the end of April or beginning of May.

{¶12} To build the roadway, the topsoil must first be stripped until a firm base is reached. To achieve a relatively even elevation of the road, cuts and fills are made to the base layer. For the embankment layer of the road, the fill soil used must be of a certain plasticity and stability so that the top of the layer (the subgrade) can be compacted to

create a uniform weight bearing surface. After the subgrade is compacted, it is proof-rolled to ensure its stability. The next layer is the aggregate base, which consists of ten inches of slag. Then the road is prepared for the installation of curbs. After the curbs are installed, additional slag is added to make a consistent elevation with the curb, and repairs are made to areas that the curb-installation machinery tends to damage. The entire surface is then prepared for the laying of four inches of asphalt.

**{¶13}** When Monroe Excavating stripped the topsoil, it turned out to be much deeper than estimated from the design plans, requiring additional work. Monroe testified they had difficulty finding a firm base to support the road. For the embankment, Monroe testified that Marchionda had instructed him to use the soil excavated from the detention pond as the fill material. Monroe testified that although that material was too moist to be suitable for the embankment, Ridgely Park wanted to attempt to use it in the hopes that it would be suitable once it was able to dry. Ridgely Park contested Monroe's account of the facts, and claimed that the decision to use the pond soil was made solely by Monroe, without any discussion with or input from Ridgely Park.

**{¶14}** Monroe Excavating allowed time for the soil to dry, but the wet conditions did not allow drying to happen. After the first attempt had been made at embankment and subcompaction, much of the roadway did not pass the proof-roll testing. Much of the work needed to be redone, and Monroe Excavating took various actions to attempt to achieve an acceptable subgrade, such as the installation of geotextile matting. Additional work was also required because Ridgely Park made numerous changes to the design plans for the road throughout Monroe Excavating's performance. Some of the design changes were necessary due to the unforeseen depth of the topsoil, and some were made for aesthetic or other planning purposes.

**{¶15}** Due to the many difficulties encountered, as well as the design changes, Monroe Excavating had difficulty keeping track of which charges were or were not contemplated in the original agreement between the parties. According to Monroe's testimony, the parties agreed to convert to hourly billing, and Monroe Excavating began to record its charges accordingly in September of 2006. One of the surveyors from Western Reserve, Mahoney, testified that he had participated via telephone in a meeting between

Monroe and Kosec, wherein it was stated that Monroe Excavating would start to bill by time and material rather than unit cost. Marchionda testified that he had participated in a meeting with Monroe, one of Monroe Excavating's operators, and Kosec, during which the parties discussed soil issues and the use of hourly billing. Marchionda was of the belief that they had decided that Monroe Excavating would bill at both an hourly and a unit basis until the end of the project, at which point the parties would decide on the most economical way to compensate Monroe Excavating. Kosec testified that the parties never discussed hourly billing at any point, and that Monroe Excavating was never authorized to bill on an hourly basis.

{¶16} Once Monroe Excavating achieved an acceptable base, installed the slag, and prepared the roadway for the installation of curbs, Ridgely Park used a different company to do the actual installation of the curbs. Monroe Excavating then completed the backfill of slag, repair work, and preparation of the surface for asphalt, which was also installed by a different company. Monroe Excavating charged a total of $333,311.76 for its work, and Ridgely Park had paid $276,785.99 up to the point that it began to dispute Monroe Excavating's charges, leaving a deficit of $56,750.77.

{¶17} The magistrate found that Proposal 187 was not the final agreement between the parties, and that various terms listed in the proposal, including the no-oral-modification clause, did not apply to the final oral agreement that was reached. The magistrate found Kosec to be the less credible witness, and held that Ridgely Park had instructed Monroe Excavating to use the unsuitable pond soil as fill, and had authorized Monroe Excavating to convert to hourly billing. The magistrate made a number of findings regarding the charges for specific tasks billed by Monroe Excavating, and concluded that Monroe Excavating had met its burden of proof as to $44,121.22 of the damages claimed. Ridgely Park filed objections which the trial court overruled, and entered judgment adopting the magistrate's decision in whole.

## Contract Formation and Parol Evidence

{¶18} In its first of four assignments of error, Ridgely Park asserts:

{¶19} "The trial court erred in relying upon parole [sic] evidence that is contrary to

the written agreement between the parties."

{¶20} Ridgely argues that Proposal 187 constituted a written contract between the parties, and that the trial court was therefore prohibited from considering parol evidence to determine that an agreement with different terms had been reached by the parties. The parties agree that some manner of express contract existed between them. However, they dispute whether they reached an agreement in writing around April 28, 2006, or if the parties reached an oral agreement shortly after that date, with different terms.

{¶21} In order to "protect the integrity of written contracts," the parol evidence rule prevents a party to a final written contract from attacking the contract with alleged evidence of conflicting prior or contemporaneous agreements. *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 440, 662 N.E.2d 1074. In order to determine whether the parol evidence rule should apply, one must first determine whether a purported contract is in fact a final and complete agreement between the parties. "[T]he parol evidence rule has no application until the initial issue of whether the parties intended the proffered document to be an expression of their agreement has been resolved." *Natl. City Bank, Akron v. Donaldson* (1994), 95 Ohio App.3d 241, 245, 642 N.E.2d 58. A trial court may consider any admissible evidence to determine whether a writing is a complete and integrated contract between the parties. Id. In order to presume that a writing is a final and integrated contract, it must be facially complete and unambiguous. *Deutsche Bank Natl. Trust Co. v. Pevarski*, 187 Ohio App.3d 455, 932 N.E.2d 887, at ¶45.

{¶22} The construction of a written contract is a matter of law. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, at paragraph one of the syllabus. However, when faced with ambiguities, a trial court's determination of the intent of the contracting parties involves a factual inquiry. *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, 474 N.E.2d 271. While questions of law are reviewed de novo, findings of fact are to be given great deference by an appellate court. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio

St.3d 107, 108, 652 N.E.2d 684.   A reviewing court should make all reasonable presumptions in favor of the trial court's judgment and findings of fact. *Karches v. City of Cincinnati* (1988), 38 Ohio St.3d 12, 19, 526 N.E.2d 1350.   If a trial court's decision on a question of fact that is supported by some competent, credible evidence, it must not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 8 O.O.3d 261, 376 N.E.2d 578.

{¶23}  In order to form a valid contract, an offer must be accepted by the offeree. Whether a contractual offer and acceptance have been made is a question of fact. *KeyBank Natl. Assn. v. Mazer Corp.*, 188 Ohio App.3d 278, 2010-Ohio-1508, 935 N.E.2d 428, at ¶36; *Oglebay Norton Co. v. Armco, Inc.* (1990), 52 Ohio St.3d 232, 235, 556 N.E.2d 515.   The offeror has the power to limit or specify the power and method of acceptance.  *Foster v. Ohio State University* (1987), 41 Ohio App.3d 86, 87-88, 534 N.E.2d 1220, citing 1 Corbin on Contracts (1963) 157-166, Sections 38 and 39.   The acceptance of an offer must go to all of the terms of the offer, and may not make material changes to the terms.  *Goldfarb v. The Robb Report, Inc.* (1991), 77 Ohio App.3d 362, 369, 602 N.E.2d 329, citing *Karas v. Brogan* (1978), 55 Ohio St.2d 128, 129, 9 O.O.3d 107, 378 N.E.2d 470.   An acceptance that changes the terms of the contract does not create a binding contract, and instead constitutes a counter-offer.  *Foster* at 88, citing 1 Restatement of the Law 2d, Contracts (1981) 145, Section 59.   More specifically, and applicable to the case at hand, when an offeror presents a written offer that specifies that a written signature on the offer constitutes acceptance, a contract is not formed when the offeree orally accepts and modifies the terms of the offer.  *Foster* at 87-88.   The offeree's action in that context is not an acceptance, but an oral counter-offer.

{¶24}  Here, Monroe Excavating presented a signed written offer, Proposal 187, to Ridgely Park on April 18, 2006.   The bottom of the document provides a space for signatures and "date of acceptance," and states "Acceptance of Proposal.   The above prices, specifications and conditions are satisfactory and hereby accepted.   You are authorized to do the work specified.   Payment will be made as outlined above."   This language specifies that acceptance should be in the form of a written signature on

Proposal 187. The parties agree that no authorized agent of Ridgely Park signed Proposal 187. There was no testimony in the record describing an agent of Ridgely Park orally accepting the terms of Proposal 187 in their entirety. However, shortly after April 18, 2006, and prior to Monroe Excavating's performance, Kosec orally informed Monroe Excavating of new project specifications, including a reduction of the development from 35 to 21 lots, and a change in the scope of Monroe Excavating's work. This is not an acceptance of Proposal 187, but rather an oral counter-offer.

{¶25} Ridgely Park claims that Monroe Excavating made an admission in its pleadings that Ridgely Park accepted Proposal 187, and argues that such an admission conclusively establishes that Proposal 187 constituted a binding written agreement between the parties. However, Monroe Excavating's complaint alleges that Ridgely Park accepted the proposal, and then "entered into an oral contract." This is not an unequivocal admission that the written proposal constituted a complete and final contract between the parties. Moreover, a portion of the terms listed in Proposal 187 was found to have been used by the parties in forming a subsequent oral agreement, and thus a part of Proposal 187 was in fact a partial reflection of the agreement eventually reached by the parties. As a result, the parties referred to Proposal 187 when testifying regarding their contractual arrangement. However, the parties' combined references to Proposal 187 and the contract are not admissions that Proposal 187 and the final contract are one in the same. Ridgely Park's argument on this point is meritless.

{¶26} Additionally, Ridgely Park takes issue with the fact that the trial court, at one point in its opinion, incorrectly states that none of the parties ever signed Proposal 187. It is true that Monroe signed Proposal 187 before submitting it to Ridgely Park. However, the trial court's opinion repeatedly and correctly states that Proposal 187 was never signed as accepted by Ridgely Park. Because Ridgely Park's manifestation of acceptance is the fact at issue here, the trial court's misstatement is immaterial.

{¶27} The parties reached an oral agreement subsequent to an alteration of the terms reflected in Proposal 187. Thus, there is competent credible evidence proving that Proposal 187 was not intended to be a final written integrated contract between the parties. The parol evidence rule therefore does not apply.

**{¶28}** Although Ridgely Park evokes the rule against parol evidence, most of the disputed extrinsic evidence was regarding additional oral agreements that occurred after the April 28, 2006 writing. Evidence of subsequent agreements or modifications of a contract does not fall within the parol evidence rule. See *Kaufman v. Byers*, 159 Ohio App.3d 238, 2004-Ohio-6346, 823 N.E.2d 530, at ¶26; *Uebelacker v. Cincom Systems, Inc.* (1988), 48 Ohio App.3d 268, 273, 549 N.E.2d 1210, citing *Norris v. Royal Indemn. Co.* (1984), 20 Ohio App.3d 206, 485 N.E.2d 754. The remainder of Ridgely Park's argument speaks to the permissibility of subsequent oral modification of contracts rather than the admission of antecedent oral agreements or understandings to prove the terms of a written contract. Thus, even if Proposal 187 had been a final integrated written agreement between the parties, most of Ridgely Park's argument against the use of parol evidence would likewise fail. Accordingly, Ridgely Park's first assignment of error is meritless.

**Verbal Modification of Contract Terms**

**{¶29}** In its second assignment of error, Ridgely Park asserts:

**{¶30}** "The trial court erred in finding there was a modification of the parties' written agreement."

**{¶31}** Ridgely Park asserts that the trial court incorrectly found that Ridgely Park waived the term in Proposal 187 that any changes to the contract must be in writing. As discussed above Proposal 187 constituted an offer, not a final integrated written agreement between the parties. Thus, the no oral modification clause in Proposal 187 would not apply to the oral agreement that was subsequently reached by the parties.

**{¶32}** Ridgely Park argues alternatively that even if there were no express limitation on the parties' ability to orally modify their contract, the evidence did not support the trial court's finding that Ridgely Park agreed to pay Monroe Excavating on an hourly basis for additional work. Ridgely Park asserts that the only evidence supporting the alleged contract modification for additional work and hourly billing was the testimony of Monroe, and that all other evidence either directly contradicted Monroe's testimony or was otherwise misconstrued by the trial court.

{¶33} Whether Ridgely Park agreed to modify the contract is a question of fact, and thus the trial court's decision on this issue should not be disturbed unless it is against the manifest weight of the evidence. *Karches*; *C.E. Morris Co.*, supra. A reviewing court should defer to the factual findings of the trial court, because it was "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273.

{¶34} The decisive factor for this issue is a meeting or meetings alleged to have occurred between Monroe, Marchionda, Kosec, and Mahoney during the late summer of 2006. According to Monroe, the parties agreed to convert to hourly billing due to both soil issues and design changes, and Monroe Excavating began to record its charges accordingly in September of 2006. Mahoney testified that Monroe, Marchionda, and Kosec held several meetings during the progress of Monroe Excavating's work. Mahoney was not physically present at any of these meetings, but he received several phone calls during or after the meetings regarding discussions or decisions. Mahoney testified that he participated via telephone in a particular meeting wherein Monroe and Kosec communicated that Monroe Excavating would start to bill by time and material rather than unit cost. Marchionda testified that he had participated in a meeting around September of 2006 with Monroe, one of Monroe Excavating's operators, and Kosec. Marichonda testified that the parties discussed soil issues and using hourly billing, but with the intent that Monroe Excavating bill at both an hourly and a unit basis until the end of the project, at which point the parties would decide on the most economical way to compensate Monroe Excavating. However, Kosec testified that the parties never discussed hourly billing at any point, and that Monroe Excavating was never authorized to bill on an hourly basis.

{¶35} Ridgely Park points to a number of other facts in order to argue that the trial court's finding regarding oral modification was erroneous, such as Davis and Monroe's knowledge prior to April of 2006 of generally wet soil conditions at the site, the absence of written change orders in relation to hourly billing, the limitations of Ridgely Park's budget, and Mahoney and Burt's lack of knowledge of the entirety of discussions that took place

between Monroe, Kosec, and Marchionda. However, these issues do not contradict the finding that hourly billing was in fact discussed between the parties, and that Ridgely Park authorized the change to hourly billing.

{¶36} The trial court took all of the foregoing testimony into consideration, and concluded that Ridgely Park did agree to the change in the billing format. The trial court found Kosec to be the less credible witness, as Kosec denied both the authorization and the mere discussion of hourly billing, whereas all other witnesses testified that at least some discussion of hourly billing took place. The trial court was in the best position to gauge the credibility of the witnesses, and it was reasonable for the trial court to believe that a verbal agreement had been reached for a change to hourly billing for additional work. The trial court's finding on this point was not against the manifest weight of the evidence. Accordingly, Ridgely Park's second assignment of error is meritless.

### Contract Terms, Additional Modification or Waiver

{¶37} In its third assignment of error, Ridgely Park asserts:

{¶38} "The trial court erred in finding a waiver of the written requirements for compliance with ODOT specifications."

{¶39} Ridgely contends that the trial court's decision erroneously ignored the fact that Monroe Excavating was obligated to comply with ODOT specifications in completing its work. Ridgely Park asserts that the language of the ODOT specifications, as well as the general industry standard, indicate that the excavator is responsible for selecting appropriate materials, and that the excavator would be the one to bear the cost of remedial work if the excavator selects inappropriate materials. Ridgely Park argues that it did not waive the requirement that Monroe Excavating observe these specifications and standards. At the end of this assignment of error, Ridgely Park also includes arguments related to the proof of work completed and reasonableness of Monroe Excavating's charges, which will be addressed in the fourth assignment of error.

{¶40} Although Ridgely Park indicates that this assignment of error is regarding the waiver of contract terms, Ridgely Park has not provided any legal support for the argument. Generally, "[w]aiver of a contract term may happen through express words or

implied by conduct." *Catz Ent., Inc. v. Valdes*, 7th Dist. Nos. 07 MA 201, 07 MA 202, 08 MA 68, 2009-Ohio-4962, at ¶42, citing *White Co. v. Canton Transportation Co.* (1936), 131 Ohio St. 190, 5 O.O. 548, 2 N.E.2d 501. Waiver must be proven through "a clear and unequivocal act by the alleged waiving party." Id. Whether a party has waived a term of a contract is a question of fact. Id. Again, if a trial court's decision on a question of fact that is supported by some competent, credible evidence, it must not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 8 O.O.3d 261, 376 N.E.2d 578.

**{¶41}** At trial, the parties contested the extent to which Monroe Excavating was required to comply with ODOT specifications, in terms of the various steps of Monroe Excavating's performance, and in terms of the final product. Ridgely Park alleged that Monroe Excavating was required to follow all ODOT specifications, because the roads in the development would eventually be dedicated to public use, and because Monroe Excavating made reference to ODOT specifications in its initial proposal for the project. Monroe Excavating showed that all subsequent proposals had removed references to ODOT specifications, and alleged that excavators are not required to follow ODOT specifications in the course of the privately-funded construction of a road, as long as the final product meets county or township standards.

**{¶42}** Regardless of the exact extent to which the ODOT standards applied to the parties' contract, the trial court did in fact consider the language of the ODOT specifications, as well as the general industry standards regarding an excavator's obligation to use suitable materials, and found that they were generally applicable to this case. In its findings of fact, the trial court noted that "the selection of the fill routinely is the prerogative of the excavator and therefore, the risk of bearing the consequences of its failure lies therewith." Thus, Ridgely Park's claim that the trial court ignored the applicability of these standards is not true. However, the trial court went on to find that Marchionda had instructed Monroe Excavating to use the unsuitable pond fill for the initial attempt at embankment, and thus the trial court held that the departure from these standards was done at the behest of Ridgely Park.

**{¶43}** In support of the contention that it was Monroe Excavating who selected the

unsuitable fill, Ridgely Park points to the testimony of Gaffney and Kosec. Gaffney testified that excavators are generally responsible for determining what kind of fill to use. This testimony is not relevant to the question of whether Marchionda instructed Monroe Excavating to use the pond fill in this specific situation. Kosec testified that the decision to use the pond fill was made by Monroe, and that Monroe did not discuss this issue with Kosec prior to the first attempt at embankment. However, Monroe testified that Marchionda had instructed him to use the soil excavated from the pond as fill for the embankments. And although Monroe thought the fill was too moist to be suitable material, Ridgely Park's representatives wanted to "take the chance" in the hopes that the material would be acceptable once it was able to dry.

{¶44} Given the foregoing, this issue boiled down to a determination of whether or not Ridgely Park instructed Monroe Excavating to use dirt from the pond excavation as fill for the roads, thereby waiving any potential contract term in conflict with that action. The trial court was in the best position to gauge the credibility of the witnesses, and it was reasonable for the trial court to favor Monroe's testimony that Ridgely Park instructed Monroe Excavating to use the pond dirt. The trial court's finding on this point was not against the manifest weight against the evidence. Accordingly, Ridgely Park's third assignment of error is meritless.

### Manifest Weight

{¶45} In its fourth and final assignment of error, Ridgely Park asserts:

{¶46} "The trial court's decision was against the manifest weight of the evidence."

{¶47} Ridgely Park concedes that there was a contract between the parties, and that Monroe Excavating performed all of the work claimed, but argues that the trial court's findings related to damages were against the manifest weight of the evidence.

{¶48} In addition to proving the existence of a valid contract, performance by one party, and breach by another party, the performing party must prove its damages in order to prevail on a breach of contract claim. *Allason v. Gailey*, 189 Ohio App.3d 491, 2010-Ohio-4952, 939 N.E.2d 206, at ¶56. The trial court's factual findings regarding the amount of damages should not be reversed if it is supported by some competent, credible

evidence. *Burns v. Prudential Securities, Inc.*, 167 Ohio App.3d 809, 2006-Ohio-3550, 857 N.E.2d 621, at ¶57; *C.E. Morris Co.* at 280.

{¶49} Ridgely Park contends that Monroe Excavating could not justify some of its charges because Monroe testified that his labor charges for the placement and compaction of aggregate base were not included under the line item in Proposal 187 entitled Aggregate Base, but were instead included under a different line item, entitled Subgrade Compaction. Ridgely Park points out that aggregate base and subgrade compaction are distinct activities, pursuant to the terminology of the ODOT specifications. However, Ridgely Park does not explain why possibly miscategorizing charges for a certain task would indicate that Monroe Excavation should not be paid for completing the task.

{¶50} Ridgely Park also contends that Monroe Excavating did not prove its charges for the "Prep for Curbs and Backfill" in its October 17, 2006 invoice, because a different contractor installed the curbs. The parties agree that Monroe Excavating did not install the curbs, but did perform work to prepare the road for the installation of curbs, and additional work to repair the damage to the roadway that occurred during the other company's installation of the curbs. The fact that another company installed the curbs does not indicate that Monroe Excavation should not be paid for its performance of tasks before and after the installation.

{¶51} Ridgely Park next argues that it was not reasonable for Monroe Excavating to have charged for the multiple attempts at embankment and related remedial work, because Monroe Excavating caused the problem by selecting unsuitable materials. However, as discussed in the previous assignment of error, the trial court found that Ridgely Park instructed Monroe Excavating to use the unsuitable materials.

{¶52} Ridgely Park next argues that all of the trial court's factual findings regarding damages were based solely on Monroe's testimony, and otherwise completely unsupported by the record, and further that the trial court erroneously failed to make specific findings regarding the reasonableness of each of Monroe Excavating's charges. Generally, the trial court's findings regarding the work performed by Monroe Excavating

and the charges billed in Monroe Excavating's various invoices were discussed in the testimony of various parties. The price breakdowns of various tasks were also discussed in testimony, and reflected in the various proposals and invoices submitted by the parties as exhibits. Masters, an accountant with extensive experience in road development, as well as Davis, an experienced excavator, testified specifically about the reasonableness of each of Monroe Excavating's expenses. Therefore, there was competent, credible evidence from which the trial court was able to determine the amount of damages owed to Monroe Excavating.

{¶53} Ridgely Park is asking this Court to substitute its judgment for that of the trial court regarding the credibility of the parties regarding damages. However, a determination of the credibility of the witnesses is primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, at paragraph one of the syllabus. The trial court's findings regarding damages were not against the manifest weight against the evidence. Accordingly, Ridgely Park's fourth assignment of error is meritless.

{¶54} In conclusion, the April 18, 2006 written proposal did not constitute the final agreement between the parties. The trial court's determinations of the terms of the oral agreement between the parties, any modifications thereon, and damages were supported by some competent credible evidence. Thus, Ridgely's assignments of error are meritless, and the judgment of the trial court is affirmed.

Waite, P.J., concurs.

Vukovich, J., concurs.